Donna L. JOHNSON, by her Guardian Ad Litem, Timothy J. Adler, Plaintiff-Respondent-Petitioner,

v.

Dr. Richard KOKEMOOR, Physicians Insurance Company of Wisconsin and Wisconsin Patients Compensation Fund, Defendants-Appellants-Cross Petitioners,

SACRED HEART HOSPITAL, Wisconsin Healthcare Liability Plan, Wisconsin Department of Health and Social Services and Healthcare Financing Administration, Defendants.

Supreme Court

*No. 93–3099. Oral argument November 1, 1995.—Decided March 20, 1996.*

(Also reported in 545 N.W.2d 495.)

615

616

617

For the plaintiff-respondent-petitioner there were briefs by *D. Charles Jordan, Dana J. Wachs, Heidi L. Atkins* and *Jordan & Wachs*, Eau Claire and oral argument by *D. Charles Jordan*.

For the defendants-appellants-cross petitioners there were briefs by *Douglas J. Klingberg, James F. Harrington* and *Ruder, Ware & Michler, S.C.*, Wausau and oral argument by *Douglas J. Klingberg*.

Amicus curiae brief was filed by *Nancy M. Rottier*, counsel, Madison and *Dean P. Laing* and *O'Neil, Cannon & Hollman, S.C.*, Milwaukee for the Wisconsin Academy of Trial Lawyers.

SHIRLEY S. ABRAHAMSON, J. This is a review of a published decision of the court of appeals, *Johnson v. Kokemoor*, 188 Wis. 2d 202, 525 N.W.2d 71 (Ct. App. 1994), reversing an order of the circuit court for Chippewa County, Richard H. Stafford, judge. We reverse the decision of the court of appeals and remand the cause to the circuit court for further proceedings on the question of damages.[1]

Donna Johnson (the plaintiff) brought an action against Dr. Richard Kokemoor (the defendant)[2] alleging his failure to obtain her informed consent to surgery as required by Wis. Stat. § 448.30 (1993-94).[3] The jury found that the defendant failed to adequately inform the plaintiff regarding the risks associated with her surgery. The jury also found that a reasonable person in the plaintiff's position would have refused to

---

[1] The trial was bifurcated at the circuit court. The jury decided only the liability issue; the issue of damages has not been tried.

[2] While there are other defendants in this case, in the interest of clarity we refer only to Dr. Kokemoor as the defendant.

[3] All future statutory references are to the 1993-94 volume of the Wisconsin Statutes.

consent to surgery by the defendant if she had been fully informed of its attendant risks and advantages.[4]

The circuit court denied the defendant's motions to change the answers in the special verdict and, in the alternative, to order a new trial. In a split decision, the court of appeals reversed the circuit court's order.

This case presents the issue of whether the circuit court erred in admitting evidence that the defendant, in undertaking his duty to obtain the plaintiff's informed consent before operating to clip an aneurysm, failed (1) to divulge the extent of his experience in performing this type of operation; (2) to compare the morbidity and mortality rates[5] for this type of surgery among experienced surgeons and inexperienced surgeons like himself; and (3) to refer the plaintiff to a tertiary care center staffed by physicians more experienced in performing the same surgery.[6] The

---

[4] The parties agreed to a special verdict form requiring the jury to answer the following two questions:

(1) Did Dr. Richard Kokemoor fail to adequately inform Donna Johnson of the risks and advantages of her surgery?

(2) If you have answered Question 1 "yes", then and then only answer this question: Would a reasonable person in Donna Johnson's position have refused to consent to the surgery by Dr. Richard Kokemoor had she been informed of the risks and advantages of the surgery?

The jury answered "yes" to both questions.

[5] As used by the parties and in this opinion, morbidity and mortality rates refer to the prospect that surgery may result in serious impairment or death.

[6] In a motion brought prior to trial, the defendant attempted to bar testimony and argument relating to his personal experience with aneurysm surgery and to the relative experience of other surgeons available to perform such surgery. The defendant argued that such disclosures are not material to the issue of informed consent. The circuit court denied the

admissibility of such physician-specific evidence in a case involving the doctrine of informed consent raises an issue of first impression in this court and is an issue with which appellate courts have had little experience.

The court of appeals concluded that the first two evidentiary matters were admissible but that the third was not. The court of appeals determined that evidence about the defendant's failure to refer the plaintiff to more experienced physicians was not relevant to a claim of failure to obtain the plaintiff's informed consent. *Johnson*, 188 Wis. 2d at 223. Furthermore, the court of appeals held that the circuit court committed prejudicial error in admitting evidence of the defendant's failure to refer, because such evidence allowed the jury to conclude that the defendant performed negligently simply because he was less experienced than other physicians, even though the defendant's negligence was not at issue in this case. *Johnson*, 188 Wis. 2d at 224.[7] The court of appeals therefore remanded the cause to the circuit court for a new trial.[8]

The plaintiff's position is that the court of appeals erred in directing a new trial. The defendant's position

---

defendant's motion and also ruled that the plaintiff could present expert testimony that the defendant should have advised her of and referred her to more experienced neurosurgeons.

[7] Prior to trial, the plaintiff had voluntarily dismissed a cause of action alleging that the defendant was negligent in performing the surgery.

[8] Given the "overwhelming" evidence "that Kokemoor did not adequately inform Johnson," *Johnson v. Kokemoor*, 188 Wis. 2d 202, 227, 525 N.W.2d 71 (Ct. App. 1994), the court of appeals left to the circuit court's discretion whether it need retry the issue of the defendant's alleged failure to obtain the plaintiff's informed consent or whether it need retry only the causation issue.

in his cross-petition is that the circuit court and the court of appeals both erred in approving the admission of evidence referring to his experience with this type of surgery and to his and other physicians' morbidity and mortality statistics in performing this type of surgery.

We conclude that all three items of evidence were material to the issue of informed consent in this case. As we stated in *Martin v. Richards*, 192 Wis. 2d 156, 174, 531 N.W.2d 70 (1995), "a patient cannot make an informed, intelligent decision to consent to a physician's suggested treatment unless the physician discloses what is material to the patient's decision, i.e., all of the viable alternatives and risks of the treatment proposed." In this case information regarding a physician's experience in performing a particular procedure, a physician's risk statistics as compared with those of other physicians who perform that procedure, and the availability of other centers and physicians better able to perform that procedure would have facilitated the plaintiff's awareness of "all of the viable alternatives" available to her and thereby aided her exercise of informed consent. We therefore conclude that under the circumstances of this case, the circuit court did not erroneously exercise its discretion in admitting the evidence.

I.

We first summarize the facts giving rise to this review, recognizing that the parties dispute whether several events occurred, as well as what inferences should be drawn from both the disputed and the undisputed historical facts.

On the advice of her family physician, the plaintiff underwent a CT scan to determine the cause of her headaches. Following the scan, the family physician

referred the plaintiff to the defendant, a neurosurgeon in the Chippewa Falls area. The defendant diagnosed an enlarging aneurysm at the rear of the plaintiff's brain and recommended surgery to clip the aneurysm.[9] The defendant performed the surgery in October of 1990.

The defendant clipped the aneurysm, rendering the surgery a technical success. But as a consequence of the surgery, the plaintiff, who had no neurological impairments prior to surgery, was rendered an incomplete quadriplegic. She remains unable to walk or to control her bowel and bladder movements. Furthermore, her vision, speech and upper body coordination are partially impaired.

At trial, the plaintiff introduced evidence that the defendant overstated the urgency of her need for surgery and overstated his experience with performing the particular type of aneurysm surgery which she required. According to testimony introduced during the plaintiff's case in chief, when the plaintiff questioned the defendant regarding his experience, he replied that he had performed the surgery she required "several" times; asked what he meant by "several," the defendant said "dozens" and "lots of times."

In fact, however, the defendant had relatively limited experience with aneurysm surgery. He had performed thirty aneurysm surgeries during residency, but all of them involved anterior circulation aneurysms. According to the plaintiff's experts, operations performed to clip anterior circulation aneurysms are significantly less complex than those necessary to clip posterior circulation aneurysms such as the plain-

---

[9] The defendant acknowledged at trial that the aneurysm was not the cause of the plaintiff's headaches.

tiff's.[10] Following residency, the defendant had performed aneurysm surgery on six patients with a total of nine aneurysms. He had operated on basilar bifurcation aneurysms only twice and had never operated on a large basilar bifurcation aneurysm such as the plaintiff's aneurysm.[11]

The plaintiff also presented evidence that the defendant understated the morbidity and mortality rate associated with basilar bifurcation aneurysm surgery. According to the plaintiff's witnesses, the defendant had told the plaintiff that her surgery carried a two percent risk of death or serious impairment and that it was less risky than the angiogram procedure she would have to undergo in preparation for surgery. The plaintiff's witnesses also testified that the defendant had compared the risks associated with the plaintiff's surgery to those associated with routine procedures such as tonsillectomies, appendectomies and gall bladder surgeries.[12]

---

[10] The plaintiff's aneurysm was located at the bifurcation of the basilar artery. According to the plaintiff's experts, surgery on basilar bifurcation aneurysms is more difficult than any other type of aneurysm surgery.

[11] The defendant testified that he had failed to inform the plaintiff that he was not and never had been board certified in neurosurgery and that he was not a subspecialist in aneurysm surgery.

[12] The defendant testified at trial that he had informed the plaintiff that should she decide to forego surgery, the risk that her unclipped aneurysm might rupture was two percent per annum, cumulative. Since he informed the plaintiff that the risk accompanying surgery was two percent, a reasonable person in the plaintiff's position might have concluded that proceeding with surgery was less risky than non-operative management.

The plaintiff's neurosurgical experts testified that even the physician considered to be one of the world's best aneurysm surgeons, who had performed hundreds of posterior circulation aneurysm surgeries, had reported a morbidity and mortality rate of ten-and-seven-tenths percent when operating upon basilar bifurcation aneurysms comparable in size to the plaintiff's aneurysm. Furthermore, information in treatises and articles which the defendant reviewed in preparation for the plaintiff's surgery set the morbidity and mortality rate at approximately fifteen percent for a basilar bifurcation aneurysm. The plaintiff also introduced expert testimony that the morbidity and mortality rate for basilar bifurcation aneurysm operations performed by one with the defendant's relatively limited experience would be between twenty and thirty percent, and "closer to the thirty percent range."[13]

Finally, the plaintiff introduced into evidence testimony and exhibits stating that a reasonable physician in the defendant's position would have advised the plaintiff of the availability of more experienced surgeons and would have referred her to them. The plaintiff also introduced evidence stating that patients with basilar aneurysms should be referred to tertiary care centers—such as the Mayo Clinic, only 90 miles away—which contain the proper neurological intensive care unit and microsurgical facilities and

---

[13] The plaintiff introduced into evidence as exhibits articles from the medical literature stating that there are few areas in neurosurgery where the difference in results between surgeons is as evident as it is with aneurysms. One of the plaintiff's neurosurgical experts testified that experience and skill with the operator is more important when performing basilar tip aneurysm surgery than with any other neurosurgical procedure.

which are staffed by neurosurgeons with the requisite training and experience to perform basilar bifurcation aneurysm surgeries.

In his testimony at trial, the defendant denied having suggested to the plaintiff that her condition was urgent and required immediate care. He also denied having stated that her risk was comparable to that associated with an angiogram or minor surgical procedures such as a tonsillectomy or appendectomy. While he acknowledged telling the plaintiff that the risk of death or serious impairment associated with clipping an aneurysm was two percent, he also claims to have told her that because of the location of her aneurysm, the risks attending her surgery would be greater, although he was unable to tell her precisely how much greater.[14] In short, the defendant testified that his disclosure to the plaintiff adequately informed her regarding the risks that she faced.

The defendant's expert witnesses testified that the defendant's recommendation of surgery was appropriate, that this type of surgery is regularly undertaken in a community hospital setting, and that the risks attending anterior and posterior circulation aneurysm surgeries are comparable. They placed the risk accompanying the plaintiff's surgery at between five and ten percent, although one of the defendant's experts also

---

[14] The defendant maintained that characterizing the risk as two percent was accurate because the aggregate morbidity and mortality rate for all aneurysms, anterior and posterior, is approximately two percent. At the same time, however, the defendant conceded that in operating upon aneurysms comparable to the plaintiff's aneurysm, he could not achieve morbidity and mortality rates as low as the ten-and-seven-tenths percent rate reported by a physician reputed to be one of the world's best aneurysm surgeons.

627

testified that such statistics can be misleading. The defendant's expert witnesses also testified that when queried by a patient regarding their experience, they would divulge the extent of that experience and its relation to the experience of other physicians performing similar operations.[15]

## II.

We now turn to a review of Wisconsin's law of informed consent. The common-law doctrine of informed consent arises from and reflects the fundamental notion of the right to bodily integrity. Originally, an action alleging that a physician had failed to obtain a patient's informed consent was pled as the intentional tort of assault and battery. In the typical situation giving rise to an informed consent action, a patient-plaintiff consented to a certain type of operation but, in the course of that operation, was sub-

---

[15] The defendant's expert witness Dr. Patrick R. Walsh testified:

> In my personal practice, I typically outline my understanding of the natural history of aneurysms, my understanding of the experience of the neurosurgical community in dealing with aneurysms and then respond to specific questions raised by the patient. If a patient asks specifically what my experience is, I believe it is mandatory that I outline that to him as carefully as possible.

Dr. Walsh also stated that "[i]t certainly is reasonable for [the defendant] to explain to [the plaintiff] that other surgeons are available."

Dr. Douglas E. Anderson, who also testified for the defense, stated that "if the patient is asking issues about prior experience, it is reasonable . . . to proceed with a discussion of your prior experience." Dr. Anderson also stated that "if the patient asks a surgeon if there is someone who has performed more surgeries than he, it is reasonable to tell the truth."

jected to other, unauthorized operative procedures. *See, e.g., Paulsen v. Gundersen*, 218 Wis. 578, 584, 260 N.W. 448 (1935) (when a patient agrees to a "simple" operation and a physician performs a more extensive operation, the physician is "guilty of an assault and would be responsible for damages resulting therefrom"); *Throne v. Wandell*, 176 Wis. 97, 186 N.W. 146 (1922) (dentist extracting six of the plaintiff's teeth without her consent has committed a technical assault).

The court further developed the doctrine of informed consent in *Trogun v. Fruchtman*, 58 Wis. 2d 569, 207 N.W.2d 297 (1972), stating for the first time that a plaintiff-patient could bring an informed consent action based on negligence rather than as an intentional tort.[16] The court clarified Wisconsin's modern doctrine of informed consent in *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975). Wis. Stat. § 448.30 codifies the common law set forth in

---

[16] Although an action alleging a physician's failure to adequately inform is grounded in negligence, it is distinct from the negligence triggered by a physician's failure to provide treatment meeting the standard of reasonable care. The doctrine of informed consent focuses upon the reasonableness of a physician's disclosures to a patient rather than the reasonableness of a physician's treatment of that patient.

*Scaria.*[17] This statute has recently been interpreted and applied in *Martin*, 192 Wis. 2d 156.[18]

■

The concept of informed consent is based on the tenet that in order to make a rational and informed decision about undertaking a particular treatment or undergoing a particular surgical procedure, a patient has the right to know about significant potential risks involved in the proposed treatment or surgery. *Scaria*,

[17] *See Martin v. Richards*, 192 Wis. 2d 156, 174, 531 N.W.2d 70 (1995) (discussing the legislative history of Wis. Stat. § 448.30).

Wisconsin Stat. § 448.30 requires that a physician inform a patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks attending these treatments. The informed consent statute reads as follows:

**448.30 Information on alternate modes of treatment.**

Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:

**(1)** Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

**(2)** Detailed technical information that in all probability a patient would not understand.

**(3)** Risks apparent or known to the patient.

**(4)** Extremely remote possibilities that might falsely or detrimentally alarm the patient.

**(5)** Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

**(6)** Information in cases where the patient is incapable of consenting.

[18] *See also Platta v. Flatley*, 68 Wis. 2d 47, 227 N.W.2d 898 (1975).

68 Wis. 2d at 11. In order to insure that a patient can give an informed consent, a "physician or surgeon is under the duty to provide the patient with such information as may be necessary under the circumstances then existing" to assess the significant potential risks which the patient confronts. *Id.*

The information that must be disclosed is that information which would be "material" to a patient's decision. *Martin,* 192 Wis. 2d at 174. In the first of three seminal informed consent decisions relied upon by both the *Trogun* and *Scaria* courts,[19] the federal court of appeals for the District of Columbia stated that information regarding risk is material when "a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy." *Canterbury v. Spence,* 464 F.2d 772, 787 (D.C. Cir. 1972), *cert. denied,* 409 U.S. 1064 (1972). The *Canterbury* court defined as material and therefore "demanding a communication" from a physician to a patient all information regarding "the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated." *Id.* at 787-88.[20]

---

[19] *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972), *cert. denied,* 409 U.S. 1064 (1972); *Cobbs v. Grant,* 502 P.2d 1 (Cal. 1972); *Wilkinson v. Vesey,* 295 A.2d 676 (R.I. 1972).

[20] *See also* Miles J. Zaremski & Louis S. Goldstein, 1 *Medical and Hospital Negligence* § 15.05 at 17 (1988-90) (stating that "[m]ateriality is the touchstone for determining the adequacy of the disclosure . . . the crux of the issue is the effect of the nondisclosure on the patient's ability to make an intelligent choice").

According to both the *Scaria* and *Martin* courts, a physician's reasonable disclosure requires that a patient be informed regarding available options. A "reasonable disclosure" of "significant risks," stated the *Scaria* court, requires an assessment of and communication regarding "the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures if such are reasonably appropriate so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure." *Scaria*, 68 Wis. 2d at 11.[21] The *Martin* court, explicitly recognizing that the statutory doctrine of informed consent in Wisconsin is "based upon the standard expounded in *Canterbury,*" *Martin*, 192 Wis. 2d at 173, explained that a patient cannot make an informed decision to consent to the suggested treatment "unless the physician discloses what is material to the patient's decision, i.e., all of the viable alternatives and risks of the treatment proposed." *Martin*, 192 Wis. 2d at 174.

What constitutes informed consent in a given case emanates from what a reasonable person in the patient's position would want to know. *Scaria*, 68 Wis. 2d at 13; *Martin*, 192 Wis. 2d at 174. This standard regarding what a physician must disclose is described as the prudent patient standard; it has been embraced

[21] For a discussion of informed consent from the legal and medical perspectives, see also Paul S. Applebaum, Charles W. Lidz, & Alan Meisel, *Informed Consent: Legal Theory and Clinical Practice* (1987).

by a growing number of jurisdictions since the *Canterbury* decision.[22]

The *Scaria* court emphasized that those "disclosures which would be made by doctors of good standing, under the same or similar circumstances, are certainly relevant and material" in assessing what constitutes adequate disclosure, adding that physician disclosures conforming to such a standard "would be adequate to fulfill the doctor's duty of disclosure in most instances." *Scaria*, 68 Wis. 2d at 12. But the evidentiary value of what physicians of good standing consider adequate disclosure is not dispositive, for ultimately "the extent of the physician's disclosures is driven . . . by what a reasonable person under the circumstances then existing would want to know." *Martin*, 192 Wis. 2d at 174; *see also Scaria*, 68 Wis. 2d at 13.[23]

---

[22] Wisconsin's adoption of this standard in *Scaria* is discussed in *Medical Malpractice: Concepts and Wisconsin Cases*, Staff Paper #2 of the Medical Malpractice Committee, Wisconsin Legislative Council Reports 1, 2 (1976); John S. Schliesmann, *Torts*, 59 Marq. L. Rev. 417, 417-19 (1976). For a more general overview of the history of and distinctions between the traditional professional physician standard and the prudent patient standard, see Applebaum, *supra*, 41-49; David W. Louisell & Harold Williams, 2 *Medical Malpractice* § 22.05 (2d ed. 1987) (pointing out that the professional physician standard has been criticized for being vague and thereby conferring almost unlimited discretion on the treating physician); Zaremski & Goldstein, *supra*, § 15.03 & nn.18-20 (collecting cases).

[23] We recognize, as did the *Scaria* court, that there must be some limitation upon the doctor's duty to disclose risks involved. In *Scaria*, we cautioned:

A doctor should not be required to give a detailed technical medical explanation that in all probability the patient would not understand. He should not be required to discuss risks that are apparent

"The information that is reasonably necessary for a patient to make an informed decision regarding treatment will vary from case to case." *Martin*, 192 Wis. 2d at 175.[24] The standard to which a physician is held is determined not by what the particular patient being treated would want to know, but rather by what a reasonable person in the patient's position would want to know. *Scaria*, 68 Wis. 2d at 13.

## III.

Before addressing the substantive issues raised by the parties, we briefly outline the standards of review which we apply to the circuit court's evidentiary ruling admitting the three items of evidence in dispute in this case.

The defendant argues that the circuit court erred in admitting the evidence. He asks the court to declare that the three pieces of evidence at issue are not admissible as a matter of law in informed consent cases.[25]

---

> or known to the patient. Nor should he be required to disclose extremely remote possibilities that at least in some instances might only serve to falsely or detrimentally alarm the particular patient. Likewise, a doctor's duty to inform is further limited in cases of emergency or where the patient is a child, mentally incompetent or a person is emotionally distraught or susceptible to unreasonable fears.

*Scaria*, 68 Wis. 2d at 12-13 (note omitted). Similar limitations on a physician's duty to disclose were subsequently incorporated into Wis. Stat. § 448.30.

[24] *See also* Zaremski & Goldstein, *supra*, § 15.01 at 3 ("the scope of the disclosure is to be viewed in conjunction with the circumstances of each individual case").

[25] Under Wisconsin's doctrine of informed consent, whenever the determination of what a reasonable person in the patient's position would want to know is open to debate by reasonable people, the issue of informed consent is a question

The general rule is that a circuit court's decision with regard to the relevance of proffered evidence is a discretionary decision. *State v. Pittman*, 174 Wis. 2d 255, 267, 496 N.W.2d 74 (1993). Evidence is relevant when it "tends 'to make the existence of [a material fact] more probable or less probable than it would be without the evidence.'" *In Interest of Michael R.B.*, 175 Wis. 2d 713, 724, 499 N.W.2d 641 (1993) (quoting *State v. Denny*, 120 Wis. 2d 614, 623, 357 N.W.2d 12 (Ct. App. 1984)); Wis. Stat. § 904.01.[26] Material facts are those that are of consequence to the merits of the litigation. *In Interest of Michael R.B.*, 175 Wis. 2d at 724.

Evidence which is relevant may nevertheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

---

for the jury. *Martin*, 192 Wis. 2d at 172-73; *Platta*, 68 Wis. 2d at 60; *see also Canterbury*, 464 F.2d at 788.

In *Martin*, we upheld that part of a court of appeals decision reversing the circuit court's exclusion as a matter of law of certain evidence relating to the physician's failure to disclose a one-to-three-percent chance that the plaintiff might suffer intracranial bleeding following a serious head injury. The circuit court had determined that the disputed information involved "extremely remote possibilities" and was therefore not subject to disclosure under Wis. Stat. § 448.30(4) as a matter of law. Instead, we noted that while the undisclosed risk may have been small, "such risk may be significant to a patient's decision in light of the potentially severe consequences" and therefore should have been admitted. *Martin*, 192 Wis. 2d at 168.

[26] Wis. Stat. § 904.01 provides as follows:

**Definition of "relevant evidence."** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

the issues, or misleading the jury. *State v. Patricia A.M.*, 176 Wis. 2d 542, 554, 500 N.W.2d 289 (1993); Wis. Stat. § 904.03.[27] It is not enough that the evidence will be prejudicial; "exclusion is required only if the evidence is *unfairly* prejudicial." *Patricia A.M.*, 176 Wis. 2d at 554.

The question of whether otherwise admissible evidence is nevertheless unfairly prejudicial rests with the discretion of the circuit court. *Featherly v. Continental Ins. Co.*, 73 Wis. 2d 273, 243 N.W.2d 806 (1976). This court will not conclude that a circuit court erroneously exercised its discretion when there is a reasonable basis for the circuit court's determination.

Finally, if the circuit court erred in admitting the evidence, reversal or a new trial is required only if the improper admission of evidence has affected the substantial rights of the party seeking relief. Wis. Stat. § 805.18(2).[28]

---

[27] Wis. Stat. § 904.03 provides as follows:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[28] Wis. Stat. § 805.18(2) provides as follows:

No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of drawing, selection or misdirection of jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the

636

## IV.

The defendant contends that the circuit court erred in allowing the plaintiff to introduce evidence regarding the defendant's limited experience in operating upon aneurysms comparable to the plaintiff's aneurysm. Wisconsin's law of informed consent, the defendant continues, requires a physician to reveal only those risks inherent in the treatment. Everyone agrees, argues the defendant, that he advised the plaintiff regarding those risks: the potential perils of death, a stroke or blindness associated with her surgery.

The defendant argues that the circuit court's decision to admit evidence pertaining to his surgical experience confused relevant information relating to treatment risks with irrelevant and prejudicial information that the defendant did not possess the skill and experience of the very experienced aneurysm surgeons. Therefore, according to the defendant, the jury's attention was diverted from a consideration of whether the defendant made required disclosures regarding treatment to the question of who was performing the plaintiff's operation. Thus, the defendant contends, the circuit court transformed a duty to reasonably inform into a duty to reasonably perform the surgery, even though the plaintiff was not alleging negligent treatment.

The doctrine of informed consent should not, argues the defendant, be construed as a general right to information regarding possible alternative procedures, health care facilities and physicians. Instead, urges the defendant, the doctrine of informed consent

party seeking to reverse or set aside the judgment, or to secure a new trial.

637

should be viewed as creating a "bright line" rule requiring physicians to disclose only significant complications intrinsic to the contemplated procedure. The defendant interprets Wis. Stat. § 448.30 as an embodiment of this more modest definition of informed consent. In sum, the defendant urges that the statutory provisions require disclosure of risks associated with particular "treatments" rather than the risks associated with particular physicians.[29]

[29] The defendant also argues that the plaintiff is trying to disguise what is actually a negligent misrepresentation claim as an informed consent claim so that she might bring before the jury otherwise inadmissible evidence regarding the defendant's experience and relative competence.

The tort of negligent misrepresentation occurs when one person negligently gives false information to another who acts in reasonable reliance on the information and suffers physical harm as a consequence of the reliance. *Restatement (Second) of Torts*, § 311(1) (1965). An overlap exists between a claim pleading this tort and one alleging a failure to provide informed consent. As the commentary to § 311 of the *Restatement* points out:

> The rule stated in this Section finds particular application where it is a part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends. Thus it is as much a part of the professional duty of a physician to give correct information as to the character of the disease from which his plaintiff is suffering, where such knowledge is necessary to the safety of the patient or others, as it is to make a correct diagnosis or to prescribe the appropriate medicine.

*Restatement (Second) of Torts*, § 311(1) cmt. b (1965).

Because of this overlap between negligent misrepresentation and informed consent, it is not surprising that allegations made and evidence introduced by the plaintiff might have fit comfortably under either theory. But this overlap does not preclude the plaintiff from making allegations and introducing evidence in an informed consent case which might also have

638

We reject the defendant's proposed bright line rule that it is error as a matter of law to admit evidence in an informed consent case that the physician failed to inform the patient regarding the physician's experience with the surgery or treatment at issue. The prudent patient standard adopted by Wisconsin in *Scaria* is incompatible with such a bright line rule.

As *Scaria* states and as *Martin* confirms, what a physician must disclose is contingent upon what, under the circumstances of a given case, a reasonable person in the patient's position would need to know in order to make an intelligent and informed decision. *Scaria*, 68 Wis. 2d at 13; *Martin*, 192 Wis. 2d at 174. The question of whether certain information is material to a patient's decision and therefore requires disclosure is rooted in the facts and circumstances of the particular case in which it arises. *Martin*, 192 Wis. 2d at 175.

The cases upon which the *Trogun* and *Scaria* courts relied in fashioning Wisconsin's current doctrine of informed consent rejected the concept of bright line rules. The "scope of the disclosure required of physicians," stated the California Supreme Court, "defies simple definition" and must therefore "be measured by the patient's need, and that need is whatever information is material to the decision." *Cobbs v. Grant*, 502 P.2d 1, 10, 11 (Cal. 1972). "The amount of disclosure can vary from one patient to another," stated the Rhode Island Supreme Court, because "[w]hat is reasonable disclosure in one instance may not be reasonable in another." *Wilkinson v. Vesey*, 295 A.2d 676, 687-88 (R.I.

been pled in a negligent misrepresentation case. This case was pled and proved under the tort of failure to procure informed consent.

1972). Finally, the *Canterbury* court's decision—which, as the *Martin* court underscored last term, provides the basis for Wisconsin's doctrine of informed consent, *Martin*, 192 Wis. 2d at 173—states explicitly that under the doctrine of informed consent, "[t]here is no bright line separating the significant from the insignificant." *Canterbury*, 464 F.2d at 788.

Wisconsin Stat. § 448.30 explicitly requires disclosure of more than just treatment complications associated with a particular procedure. Physicians must, the statute declares, disclose "the availability of all alternate, viable medical modes of treatment" in addition to "the benefits and risks of these treatments."

The *Martin* court rejected the argument that Wis. Stat. § 448.30 was limited by its plain language to disclosures intrinsic to a proposed treatment regimen. The *Martin* court stated that Wis. Stat. § 448.30 "should not be construed so as to unduly limit the physician's duty to provide information which is reasonably necessary under the circumstances." *Martin*, 192 Wis. 2d at 175.[30] "There can be no dispute," the

[30] Ruling before the publication of *Martin* on the admissibility of evidence pertaining to the defendant's experience, the circuit court made a similar point:

> I've also looked at the informed consent instruction, 1023.2, and it says that the doctor or physician is under a duty to make such disclosures that will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to make a proper consent, so I don't think that—that we're limited to the references made in the statute. I think that anything that's necessary to a reasonable person to arrive at an informed and reasonable consent is allowable evidence, so clearly the six times [i.e. the six post-residency aneurysm operations which the defendant had performed] is allowable evidence and the fact that he made a statement that he had done this lots of time, there's nothing wrong with that [being admitted].

*Martin* court declared, "that the language in *Scaria* . . . requires that a physician disclose information necessary for a reasonable person to make an intelligent decision." *Id.*

In this case, the plaintiff introduced ample evidence that had a reasonable person in her position been aware of the defendant's relative lack of experience in performing basilar bifurcation aneurysm surgery, that person would not have undergone surgery with him. According to the record the plaintiff had made inquiry of the defendant's experience with surgery like hers. In response to her direct question about his experience he said that he had operated on aneurysms comparable to her aneurysm "dozens" of times. The plaintiff also introduced evidence that surgery on basilar bifurcation aneurysms is more difficult than any other type of aneurysm surgery and among the most difficult in all of neurosurgery. We conclude that the circuit court did not erroneously exercise its discretion in admitting evidence regarding the defendant's lack of experience and the difficulty of the proposed procedure. A reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery.

We also reject the defendant's claim that even if this information was material, it should have been excluded because its prejudicial effect outweighed its probative value. The defendant contends that the admission of such evidence allowed the jury to infer that the plaintiff's partial paralysis was a product of the defendant's lack of experience and skill rather than a consequence of his alleged failure to inform.

 We disagree with the defendant's claim that evidence pertaining to the defendant's experience was unduly and unfairly prejudicial. While a jury might confuse negligent failure to disclose with negligent treatment,[31] the likelihood of confusion is nonexistent or de minimis in this case. The plaintiff dismissed her negligent treatment claim before trial. It is thus unlikely that the jury would confuse an issue not even before it with the issue that was actually being tried. We therefore conclude that the defendant was not unduly or unfairly prejudiced by the admission of evidence reflecting his failure to disclose his limited prior experience in operating on basilar bifurcation aneurysms.

## V.

The defendant next argues that the circuit court erred in allowing the plaintiff to introduce evidence of morbidity and mortality rates associated with the surgery at issue. The defendant particularly objects to comparative risk statistics purporting to estimate and compare the morbidity and mortality rates when the surgery at issue is performed, respectively, by a physician of limited experience such as the defendant and by the acknowledged masters in the field. Expert testimony introduced by the plaintiff indicated that the morbidity and mortality rate expected when a surgeon with the defendant's experience performed the surgery

---

[31] *See* Marjorie Maguire Schultz, *From Informed Consent to Patient Choice: A New Protected Interest,* 95 Yale L.J. 219, 228-29 (1985). One could only completely eliminate the potential that such confusion might arise by categorically prohibiting all actions predicated on an alleged failure to procure informed consent.

would be significantly higher than the rate expected when a more experienced physician performed the same surgery.

The defendant asserts that admission of these morbidity and mortality rates would lead the jury to find him liable for failing to perform at the level of the masters rather than for failing to adequately inform the plaintiff regarding the risks associated with her surgery. Furthermore, contends the defendant, statistics are notoriously inaccurate and misleading.

As with evidence pertaining to the defendant's prior experience with similar surgery, the defendant requests that the court fashion a bright line rule as a matter of law that comparative risk evidence should not be admitted in an informed consent case. For many of the same reasons which led us to conclude that such a bright line rule of exclusion would be inappropriate for evidence of a physician's prior experience, we also reject a bright line rule excluding evidence of comparative risk relating to the provider.

The medical literature identifies basilar bifurcation aneurysm surgery as among the most difficult in neurosurgery. As the plaintiff's evidence indicates, however, the defendant had told her that the risks associated with her surgery were comparable to the risks attending a tonsillectomy, appendectomy or gall bladder operation. The plaintiff also introduced evidence that the defendant estimated the risk of death or serious impairment associated with her surgery at two percent. At trial, however, the defendant conceded that because of his relative lack of experience, he could not hope to match the ten-and-seven-tenths percent morbidity and mortality rate reported for large basilar bifurcation aneurysm surgery by very experienced surgeons.

643

The defendant also admitted at trial that he had not shared with the plaintiff information from articles he reviewed prior to surgery. These articles established that even the most accomplished posterior circulation aneurysm surgeons reported morbidity and mortality rates of fifteen percent for basilar bifurcation aneurysms. Furthermore, the plaintiff introduced expert testimony indicating that the estimated morbidity and mortality rate one might expect when a physician with the defendant's relatively limited experience performed the surgery would be close to thirty percent.

Had a reasonable person in the plaintiff's position been made aware that being operated upon by the defendant significantly increased the risk one would have faced in the hands of another surgeon performing the same operation, that person might well have elected to forego surgery with the defendant. Had a reasonable person in the plaintiff's position been made aware that the risks associated with surgery were significantly greater than the risks that an unclipped aneurysm would rupture, that person might well have elected to forego surgery altogether. In short, had a reasonable person in the plaintiff's position possessed such information before consenting to surgery, that person would have been better able to make an informed and intelligent decision.

The defendant concedes that the duty to procure a patient's informed consent requires a physician to reveal the general risks associated with a particular surgery. The defendant does not explain why the duty to inform about this general risk data should be interpreted to categorically exclude evidence relating to provider-specific risk information, even when that provider-specific data is geared to a clearly delineated surgical procedure and identifies a particular provider

as an independent risk factor. When different physicians have substantially different success rates, whether surgery is performed by one rather than another represents a choice between "alternate, viable medical modes of treatment" under § 448.30.

For example, while there may be a general risk of ten percent that a particular surgical procedure will result in paralysis or death, that risk may climb to forty percent when the particular procedure is performed by a relatively inexperienced surgeon. It defies logic to interpret this statute as requiring that the first, almost meaningless statistic be divulged to a patient while the second, far more relevant statistic should not be. Under *Scaria* and its progeny as well as the codification of *Scaria* as Wis. Stat. § 448.30, the second statistic would be material to the patient's exercise of an intelligent and informed consent regarding treatment options. A circuit court may in its discretion conclude that the second statistic is admissible.

The doctrine of informed consent requires disclosure of "all of the viable alternatives and risks of the treatment proposed" which would be material to a patient's decision. *Martin*, 192 Wis. 2d at 174. We therefore conclude that when different physicians have substantially different success rates with the same procedure and a reasonable person in the patient's position would consider such information material, the circuit court may admit this statistical evidence.[32]

---

[32] *See* Aaron D. Twerski & Neil B. Cohen, *Comparing Medical Providers: A First Look at the New Era of Medical Statistics*, 58 Brook. L. Rev. 5 (1992). Professors Twerski and Cohen note that the development of sophisticated data regarding risks of various procedures and statistical models comparing the suc-

We caution, as did the court of appeals, that our decision will not always require physicians to give patients comparative risk evidence in statistical terms to obtain informed consent.[33] Rather, we hold that evidence of the morbidity and mortality outcomes of different physicians was admissible under the circumstances of this case.

---

cess rates of medical providers signal changes in informed consent law. Specifically, they state:

> The duty to provide information may require more than a simple sharing of visceral concerns about the wisdom of undertaking a given therapeutic procedure. Physicians may have a responsibility to identify and correlate risk factors and to communicate the results to patients as a predicate to fulfilling their obligation to inform.

*Id.* at 6.

*See also* Douglas Sharrott, *Provider-Specific Quality-of-Care Data: A Proposal for Limited Mandatory Disclosure*, 58 Brook L. Rev. 85 (1992) (stating that it is difficult to refute the argument that provider-specific data, once disclosed to the public by the government, should also be disclosed to patients because the doctrine of informed consent requires a physician to inform a patient of both material risks and alternatives to a proposed course of treatment).

[33] For criticisms of medical performance statistics and cautions that provider-specific outcome statistics must be carefully evaluated to insure their reliability and validity when used as evidence, see, e.g., Jesse Green, *Problems in the Use of Outcome Statistics to Compare Health Care Providers*, 58 Brook. L. Rev. 55 (1992); Paul D. Rheingold, *The Admissibility of Evidence in Malpractice Cases: The Performance Records of Practitioners*, 58 Brook. L. Rev. 75, 78-79 (1992); Sharrott, *supra*, at 92-94, 120; Twerski & Cohen, *supra*, at 8-9.

In keeping with the fact-driven and context-specific application of informed consent doctrine, questions regarding whether statistics are sufficiently material to a patient's decision to be admissible and sufficiently reliable to be non-prejudicial are best resolved on a case-by-case basis. The fundamental issue in an informed consent case is less a question of how a physician chooses to explain the panoply of treatment options and risks necessary to a patient's informed consent than a question of assessing whether a patient has been advised that such options and risks exist.

As the court of appeals observed, in this case it was the defendant himself who elected to explain the risks confronting the plaintiff in statistical terms. He did this because, as he stated at trial, "numbers giv[e] some perspective to the framework of the very real, immediate, human threat that is involved with this condition." Because the defendant elected to explain the risks confronting the plaintiff in statistical terms, it stands to reason that in her effort to demonstrate how the defendant's numbers dramatically understated the risks of her surgery, the plaintiff would seek to introduce other statistical evidence. Such evidence was integral to her claim that the defendant's nondisclosure denied her the ability to exercise informed consent.

## VI.

The defendant also asserts that the circuit court erred as a matter of law in allowing the plaintiff to introduce expert testimony that because of the difficulties associated with operating on the plaintiff's aneurysm, the defendant should have referred her to a

tertiary care center containing a proper neurological intensive care unit, more extensive microsurgical facilities and more experienced surgeons. While evidence that a physician should have referred a patient elsewhere may support an action alleging negligent treatment, argues the defendant, it has no place in an informed consent action.

The court of appeals agreed with the defendant that this evidence should have been excluded, and it further concluded that admission of this evidence created "a serious danger [that] the jury may confuse a duty to provide average quality care with a duty to adequately inform of medical risks." *Johnson*, 188 Wis. 2d at 224.

We share the concern expressed by the court of appeals and underscored by the defendant, but their concern is misplaced in this case. Here, the plaintiff was not asserting a claim for negligent performance. Just because expert testimony is relevant to one claim does not mean that it is not relevant to another.

When faced with an allegation that a physician breached a duty of informed consent, the pertinent inquiry concerns what information a reasonable person in the patient's position would have considered material to an exercise of intelligent and informed consent. *Scaria*, 68 Wis. 2d at 13; *Martin*, 192 Wis. 2d at 174. Under the facts and circumstances presented by this case, the circuit court could declare, in the exercise of its discretion, that evidence of referral would have been material to the ability of a reasonable person in the plaintiff's position to render informed consent.

The plaintiff's medical experts testified that given the nature and difficulty of the surgery at issue, the plaintiff could not make an intelligent decision or give an informed consent without being made aware that

648

surgery in a tertiary facility would have decreased the risk she faced. One of the plaintiff's experts, Dr. Haring J.W. Nauta, stated that "it's not fair not to bring up the subject of referral to another center when the problem is as difficult to treat" as the plaintiff's aneurysm was. Another of the plaintiff's experts, Dr. Robert Narotzky, testified that the defendant's "very limited" experience with aneurysm surgery rendered reasonable a referral to "someone with a lot more experience in dealing with this kind of problem." Dr. Fredric Somach, also testifying for the plaintiff, stated as follows:

> [S]he should have been told that this was an extremely difficult, formidable lesion and that there are people in the immediate geographic vicinity that are very experienced and that have had a great deal of contact with this type of aneurysm and that she should consider having at least a second opinion, if not going directly to one of these other [physicians].

Articles from the medical literature introduced by the plaintiff also stated categorically that the surgery at issue should be performed at a tertiary care center while being "excluded" from the community setting because of "the limited surgical experience" and lack of proper equipment and facilities available in such hospitals.

*Scaria* instructs us that "[t]he disclosures which would be made by doctors of good standing, under the same or similar circumstances, are certainly relevant and material" to a patient's exercise of informed consent. *Scaria*, 68 Wis. 2d at 12. Testimony by the plaintiff's medical experts indicated that "doctors of good standing" would have referred her to a tertiary

649

care center housing better equipment and staffed by more experienced physicians. Hence under the materiality standard announced in *Scaria*, we conclude that the circuit court properly exercised its discretion in admitting evidence that the defendant should have advised the plaintiff of the possibility of undergoing surgery at a tertiary care facility.

The defendant asserts that the plaintiff knew she could go elsewhere. This claim is both true and beside the point. Credible evidence in this case demonstrates that the plaintiff chose not to go elsewhere because the defendant gave her the impression that her surgery was routine and that it therefore made no difference who performed it. The pertinent inquiry, then, is not whether a reasonable person in the plaintiff's position would have known generally that she might have surgery elsewhere, but rather whether such a person would have chosen to have surgery elsewhere had the defendant adequately disclosed the comparable risks attending surgery performed by him and surgery performed at a tertiary care facility such as the Mayo Clinic, only 90 miles away.

The defendant also argues that evidence of referral is prejudicial because it might have affected the jury's determination of causation. The court of appeals reasoned that if a complainant could introduce evidence that a physician should have referred her elsewhere, "a patient so informed would almost certainly forego the procedure with that doctor." *Johnson*, 188 Wis. 2d at 224.[34]

---

[34] The court of appeals expressed concern that the plaintiff's evidence regarding the defendant's failure to refer might cause the jury to confuse a physician's duty to procure a patient's *informed consent with a separate and distinct tort establishing* a physician's duty to refer. While acknowledging that other

650

The court of appeals concluded that admitting evidence regarding a physician's failure to refer was prejudicial error because it probably affected the jury's decision about causation in favor of the plaintiff.[35] Contending that a causal connection between his failure to divulge and the plaintiff's damage is required, the defendant seems to assert that the plaintiff has offered no evidence that the defendant's failure to disclose his relevant experience or his statistical risk harmed the plaintiff. Even had the surgery been performed by a "master," the defendant argues, a bad result may have occurred.[36]

The defendant appears to attack the basic concept of causation applied in claims based on informed consent. As reflected in the informed consent jury instruction (Wis JI—Civil 1023.3 (1992)), which the defendant himself proposed and which was given at trial, the question confronting a jury in an informed consent case is whether a reasonable person in the patient's position would have arrived at a different decision about the treatment or surgery had he or she been fully informed. As reflected in the special verdict question in this case, that question asked whether "a reasonable person in Donna Johnson's position [would] have refused to consent to the surgery by Dr. Richard Kokemoor had she been fully informed of the risks and

jurisdictions have recognized a distinct duty to refer, the court of appeals observed that Wisconsin has never done so. Nor does the court do so today. We merely hold that a physician's failure to refer may, under some circumstances, be material to a patient's exercise of an intelligent and informed consent.

[35] The dissenting opinion in the court of appeals determined the error to be harmless.

[36] For discussion of this aspect of causation, see Twerski & Cohen, *supra*.

advantages of surgery." If the defendant is arguing here that the standard causation instruction is not applicable in a case in which provider-specific evidence is admitted, this contention has not been fully presented and developed.

Finally, the defendant argues that if his duty to procure the plaintiff's informed consent includes an obligation to disclose that she consider seeking treatment elsewhere, then there will be no logical stopping point to what the doctrine of informed consent might encompass. We disagree with the defendant. As the plaintiff noted in her brief to this court, "[i]t is a rare exception when the vast body of medical literature and expert opinion agree that the difference in experience of the surgeon performing the operation will impact the risk of morbidity/mortality as was the case here," thereby requiring referral. Brief for Petitioner at 40. At oral argument before this court, counsel for the plaintiff stated that under "many circumstances" and indeed "probably most circumstances," whether or not a physician referred a patient elsewhere would be "utterly irrelevant" in an informed consent case. In the vast majority of significantly less complicated cases, such a referral would be irrelevant and unnecessary.

Moreover, we have already concluded that comparative risk data distinguishing the defendant's morbidity and mortality rate from the rate of more experienced physicians was properly before the jury. A close link exists between such data and the propriety of referring a patient elsewhere. A physician who discloses that other physicians might have lower morbidity and mortality rates when performing the same procedure will presumably have access to information regarding who some of those physicians are. When the duty to share comparative risk data is mate-

rial to a patient's exercise of informed consent, an ensuing referral elsewhere will often represent no more than a modest and logical next step.[37]

Given the difficulties involved in performing the surgery at issue in this case, coupled with evidence that the defendant exaggerated his own prior experience while downplaying the risks confronting the plaintiff, the circuit court properly exercised its discretion in admitting evidence that a physician of good standing would have made the plaintiff aware of the alternative of lower risk surgery with a different, more experienced surgeon in a better-equipped facility.

For the reasons set forth, we conclude that the circuit court did not erroneously exercise its discretion in admitting the evidence at issue, and accordingly, we reverse the decision of the court of appeals and remand the cause to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court with directions.

Justice ANN WALSH BRADLEY did not participate.

---

[37] The *Canterbury* court included a duty to refer among its examples of information which, under the facts and circumstances of a particular case, a physician might be required to disclose in order to procure a patient's informed consent. The court stated: "The typical situation is where a general practitioner discovers that the patient's malady calls for specialized treatment, whereupon the duty generally arises to advise the patient to consult a specialist." *Canterbury*, 464 F.2d at 781 n.22.