Marlene BROWN and Kurt Brown, Plaintiffs-Appellants-Cross-Respondents,

v.

David G. DIBBELL, M.D., Midelfort Clinic, Ltd., a Mayo Regional Practice, Physicians Insurance Company of Wisconsin and Wisconsin Patients Compensation Fund, Defendants-Respondents-Cross-Appellants,†

Steven D. JOHNSON, M.D., Defendant-Respondent,

MERIDIAN RESOURCE CORPORATION on behalf of Benefit Plan Administrators Co. and Wisconsin Physicians Service-Medicare Part B, Defendants.

Court of Appeals

*No. 97–2181. Submitted on briefs March 16, 1998.—Decided May 19, 1998.*

(Also reported in 582 N.W.2d 134.)

†Petition to review granted.

On behalf of the plaintiffs-appellants-cross-respondents, the cause was submitted on the briefs of *George H. Senteney* and *Guelzow & Senteney, Ltd.* of Eau Claire.

On behalf of the defendants-respondents-cross-appellants, the cause was submitted on the brief of *Steven J. Caulum* and *W. Scott McAndrew* and *Bell, Metzner, Gierhart & Moore, S.C.* of Madison.

Before Cane, P.J., Myse and Hoover, JJ.

HOOVER, J. Marlene and Kurt Brown appeal a judgment finding Marlene Brown contributorily negligent in an informed consent suit she brought against Dr. David Dibbell and Dr. Steven Johnson. The Browns contend that a patient cannot be contributorily negligent for purposes of informed consent for failing to make sufficient inquiries or by opting to undergo a viable treatment option the doctor recommends. We conclude the evidence does not sustain the jury's verdict that Brown was contributorily negligent. Dibbell cross-appeals, asserting that the trial court erred by refusing to instruct the jury on circumstances that excuse the physician's nondisclosure. Again, we agree. We therefore reverse and remand for a new trial.

Brown's twin sister died of breast cancer, and she was therefore concerned when she detected a lump and tenderness in her breast. On June 9, 1993, Brown was examined by her general physician, Dr. Alfuth, who ordered a mammogram. He found an area of concern in Brown's right breast, but no precise abnormality. He

202

referred her to Dibbell for an evaluation. Alfuth recommended Dibbell, a reconstructive surgeon, because Brown had implants.

Dibbell examined the mammogram and area of concern, but did not find anything that "look[ed] particularly highly suspicious." Given her medical history, however, he told Brown her chances of developing cancer were "highly probable." He referred Brown to Johnson, a general surgeon, for a second opinion. Johnson also concluded and informed Brown that she was in a "high risk category of developing breast cancer." Neither doctor provided Brown with statistics or percentages illustrating the risk.

Both doctors recommended that Brown undergo a bilateral mastectomy. Dibbell contends that Brown met the criteria for the procedure because of her family history, fear of developing cancer and the difficulties of performing a biopsy due to the breast implants. He further asserts that: he had a lengthy, detailed discussion with Brown before surgery, addressing both the cancer risk and likely outcome of the surgery; he never told Brown she had cancer; he advised her there was nothing to indicate cancer; and he told her the radiologist recommended follow-up with another mammogram in six months. Brown contends that she was never given any treatment options, such as continued mammograms or waiting six months. She also claims that Dibbell repeatedly reassured her that, with post-operative reconstruction, she would be as cosmetically pleasing in appearance as she had been prior to the mastectomy.

Following surgery, Brown experienced extraordinary scarring to the breasts, asymmetrical nipples and unduly thin skin flaps that led to other problems. She experienced a loss of sensation and sensibility in her

breasts. She also claims deep emotional and psychological scars. She brought a medical malpractice and informed consent suit against the doctors. At trial, the jury found that Dibbell was not negligent in providing medical care, but that he violated his informed consent duties. The jury also found Brown contributorily negligent. It apportioned the negligence as 50% for both Brown and Dibbell.[1] We first consider the Browns' contention that comparative negligence principles are inapplicable in informed consent cases.

The premise behind the informed consent doctrine is that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body . . . ." *Canterbury v. Spence*, 464 F.2d 772, 780 (D.C. Cir. 1972) (quoting *Schloendorff v. Society of New York Hosp.*, 105 N.E. 92, 93 (N.Y. 1914)). True consent is the informed exercise of choice, and entails the opportunity to knowledgeably evaluate the available options and attendant risks. *Id.* The informed consent doctrine recognizes the knowledge disparity between physician and patient. "The relation of physician and patient has its foundation on the theory that the former is learned, skilled, and experienced in those subjects about which the latter ordinarily knows little or nothing . . . ." 61 AM. JUR. 2D *Physicians, Surgeons & Other Healers* § 166 at 298 (1981).

Wisconsin has long recognized a doctor's duty to inform a patient about viable treatment options and attendant risks and benefits. Our supreme court stated:

> [T]he duty of the doctor is to make such disclosures as appear reasonably necessary under circum-

---

[1] The jury found Johnson entirely non-liable. He does not join Dibbell's cross-appeal.

stances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed.

*Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 13, 227 N.W.2d 647, 654 (1975). This duty was codified in the first sentence of § 448.30, STATS., which sets forth the informed consent standard: "Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments."

■

The doctor's disclosures are determined by the objective standard of what a reasonable person similarly situated would want to know to make an informed, intelligent decision. *Martin v. Richards*, 192 Wis. 2d 156, 174–75, 531 N.W.2d 70, 78 (1995). The standard to which a physician is held is determined not by what the *particular* patient being treated would want to know, but rather by what a *reasonable* person in the patient's position would want to know. *Johnson v. Kokemoor*, 199 Wis. 2d 615, 631, 545 N.W.2d 495, 501 (1996).

■

The trial court determined that contributory negligence is available as a defense in an informed consent action. Whether a particular defense is available against a cause of action is generally a question of law reviewed de novo. *See Highlands Ins. Co. v. Continental Cas. Co.*, 64 F.3d 514, 521 (9th Cir. 1995); *Laborers Health & Welfare Trust Fund v. Westlake Dev.*, 53 F.3d 979, 981 (9th Cir. 1995); *Bryan v. James E. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1332 (11th Cir.

1994); *United States v. Wilcox*, 919 F.2d 109, 111 (9th Cir. 1990).

Brown claims that Dibbell violated his informed consent duty both by failing to provide information a reasonable patient would want to know[2] and by misinforming her as to her post-operative appearance. Dibbell contends that Brown, as a party to the informed consent colloquy, was partially responsible for any claimed lack of information. He also suggests that because the surgery was elective, she negligently elected to undergo the mastectomy.

We conclude that § 448.30, STATS., places a duty on the doctor to obtain a patient's informed consent and that, with respect to a patient consenting to a treatment option the doctor presents as viable, that patient

---

[2] She argues that this information includes the following: (1) Dibbell's conversations with radiologists and their opinions that there was a low probability of the lesion being cancerous; (2) the radiologists only recommended a six-month follow-up mammogram; (3) the radiologists found nothing wrong with Brown's left breast; (4) the risks of surgery relative to needle localization including the risks if the implants were punctured; (5) any statistics quantifying the risk; (6) her risk of getting breast cancer in the next 20 years was one out of 25 (an undisputed statistic); (7) what her risk would be if she waited; (8) she would lose all sensitivity and sensibility in her breasts; (9) the effect her social background, feelings of womanliness or self-image might have on her decision to have surgery; (10) she could consider psychiatric, psychological and/or oncological consultation; (11) any brochures or other written information on mastectomies or risks of cancer; and (12) the risks of disfigurement, sensitivity loss, undue scarring and thinning of the tissue cover.

generally would not be contributorily negligent.[3] The statute speaks solely in terms of the *doctor's* duty to disclose and discuss information related to treatment and risks. It does not intimate, let alone place upon a patient, an affirmative duty to investigate, question, or seek quantification of the information provided by the doctor. Rather, the entire gravamen of the informed consent statute is that a patient is not in a position to know treatment options and risks and, standing alone and unaided, is unable to make an informed choice. The doctor, who possesses medical knowledge and skills, has the affirmative burden both to comprehend what a reasonable patient in a similar situation would want to know and to provide the relevant information. Moreover, while every individual has a duty of ordinary care for their own person, the underpinning of the contributory negligence defense,[4] we perceive defining the dimensions of a patient's duty in an informed consent case to be a virtually impossible task. What degree of knowledge or insight can be demanded of one whom the law recognizes as unqualified to make decisions involving the complexities of medical science without assistance? The concept that a patient can be contributorily negligent, for example, by not asking enough or precisely proper questions, seems contrary to the statu-

---

[3] We are hesitant to declare an absolute rule that a patient can never be negligent when following what a physician represents as a viable treatment option.

[4] *See* WIS J I—CIVIL 1007 Contributory Negligence: Defined:

> To be free of negligence, a person must exercise ordinary care in choosing his or her course of conduct and in the pursuit of that choice. A person is not guilty of negligence in making a choice of conduct if the person has no knowledge that one course of conduct carries a greater hazard than another, provided that such lack of knowledge is not the result of the person's failure to exercise ordinary care.

tory scheme and the reason for placing the burden on the doctor.

Other jurisdictions have addressed the question whether comparative negligence principles are logically consistent with the law of informed consent. Hawaii has concluded that it is unfair and illogical to impose an affirmative duty on a patient to make an inquiry or otherwise affirmatively act with respect to informed consent. *Keomaka v. Zakaib*, 811 P.2d 478, 486 (Haw. Ct. App. 1991). "[W]here a patient has no duty in the informed consent context, we cannot see how the patient can be contributorily negligent. We agree with Professor Capron that contributory negligence 'has no place in an action for failure to obtain informed consent.' " *Id.* (quoting Capron, *Informed Consent in Catastrophic Disease Research and Treatment*, 123 U. PA. L. REV. 340, 410 (1974)). Further, although discussed within the context of a medical malpractice case, we find the following reasoning of a Washington court compelling:

> On the question of contributory negligence, in such cases as the one at bar, it is the law that "It is not a part of the duties of a patient to distrust his physician, or to set his judgment against that of the expert whom he has employed to treat him, or to appeal to other physicians to ascertain if the physician is performing his duty properly. The very relation assumes trust and confidence on the part of the patient in the capacity and skill of the physician; and it would indeed require an unusual state of facts to render a person who is possessed of no medical skill guilty of contributory negligence because he accepts the word of his physician and trusts in the efficacy of the treatment prescribed by him. A patient has the right to rely on the professional skill of his physician, without calling others

208

in to determine whether he really possesses such skill or not. The patient is not bound to call in other physicians, unless he becomes fully aware that the physician has not been, and is not, giving proper treatment . . . ."

*Kelly v. Carroll*, 219 P.2d 79, 90 (Wash. 1950) (quoting *Halverson v. Zimmerman*, 232 N.W. 754, 759 (N.D. 1950)). We perceive under § 448.30, STATS., only an affirmative duty on the physician and none on the patient. Therefore, in the context of informed consent, we agree that a patient would not be contributorily negligent by failing to ask a sufficient number of the proper questions or, in all but the most extraordinary instance, by consenting to a treatment option that a doctor presents as a viable option. The evidence does not place this case in the realm of the extraordinary. Brown was concerned about the abnormalities she found in her breast and thus sought medical advice. She followed through on Dibbell's recommendation that she obtain a second opinion. This opinion buttressed Dibbell's. At trial, the defendants did not claim that the procedure Brown claims the doctors recommended and that Dibbell performed was not medically viable. This evidence belies the jury's verdict that Brown was negligent when she opted for one viable treatment method among the several Dibbell testified Brown was afforded.

We turn now to Dibbell's cross-appeal. He claims the trial court erred by instructing the jury on informed consent. The trial court gave the following standard informed consent instruction to the jury:

A physician who proposes to perform an operation must make such disclosures as will enable a reasonable person under the circumstances confronting

the patient to exercise the patient's right to consent to, or to refuse, the operation proposed.

The doctor's disclosure must be sufficient to enable a reasonable person, situated as was the patient, to understand: his or her existing physical condition, the risks to his or her life or health which the operation imposes, and the purposes and advantages of the operation.

The doctor must inform the patient whether the operation proposed is ordinarily performed in the circumstances confronting the patient whether alternate procedures approved by the medical profession are available, what the outlook is for success or failure of each alternative procedure, and the risks inherent in each alternate procedure.

WIS J I—CIVIL 1023.2. Dibbell contends that he is entitled to a new trial because the trial court refused to inform the jury of the applicable exceptions to the duty to inform set forth in § 448.30, STATS.,[5] together with the optional fourth paragraph from the standard instruction. That paragraph reads:

If, however, the doctor comes forward and offers to you an explanation as to why the doctor did not make a disclosure to the plaintiff, and if such expla-

---

[5] Section 448.30, STATS., provides in part:

The physician's duty to inform the patient . . . does not require disclosure of:

(1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

(2) Detailed technical information that in all probability a patient would not understand.

(3) Risks apparent or known to the patient.

(4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

nation satisfies you that it was reasonable for the doctor not to have made such disclosures, then you will find that the defendant did not fail in the duties owed by the doctor to the patient.

Dibbell asserts that he came forth with specific evidence demonstrating why he did not discuss certain information with Brown and was therefore entitled to have the court instruct the jury on the exceptions provided by the jury instruction and the statute. The Browns assert that the facts of record do not provide a basis that justifies giving any of the enumerated exceptions that would relieve Dibbell from reasonably informing Brown of specific information.[6]

If an instruction is erroneous and probably misleads the jury, we will reverse the verdict because the misstatement constitutes prejudicial error. *Young v. Professionals Ins. Co.*, 154 Wis. 2d 742, 746, 454 N.W.2d 24, 26 (Ct. App. 1990). The relevant question in determining whether a jury instruction is appropriate is whether it is a correct statement of the law. *Finley v. Culligan*, 201 Wis. 2d 611, 620, 548 N.W.2d 854, 858 (Ct. App. 1996). It is error for the trial court to refuse to give a jury instruction on an issue raised by the evidence. *Wester v. Bruggink*, 190 Wis. 2d 308, 322, 527 N.W.2d 373, 379 (Ct. App. 1994).

We conclude that the court should have instructed the jury on the applicable exceptions to Dibbell's informed consent duty because the jury was probably misled as to the scope of the doctor's duty under the informed consent statute. Specifically, the jury should have been charged with both the fourth paragraph of

---

[6] *See* note 2, *supra.*

WIS J I—CIVIL 1023.2 and the appropriate statutory
exceptions under § 448.30, STATS., because neither nec-
essarily subsumes the other. The record demonstrates
that Dibbell put forth evidence explaining why he
declined to provide certain information to Brown. He
contended that he did not provide statistical informa-
tion on Brown's risk of developing cancer because, in
his opinion, such information is often confusing and
misleading. While Dibbell does not indicate which
exception this would fall under, we conclude that it
relates to the general duty to inform; a similarly situ-
ated reasonable patient would not want to be given
misleading or confusing information. The fourth para-
graph of WIS J I—CIVIL 1023.2 addresses this
circumstance. Dibbell further testified that he relied
upon the radiologists' determination that a needle
localization procedure was not a sensible option for a
variety of technical and other reasons, which a jury
might similarly view as a reasonable explanation for
nondisclosure under the fourth paragraph of the
requested instruction. Alternatively, a jury might rea-
sonably conclude that this explanation falls under
§ 448.30(2), STATS., excepting detailed technical infor-
mation beyond a patient's probable comprehension.

Dibbell explained to the jury that he thought the
necessity of flap procedures or tissue transfers was
only a remote possibility. This testimony relates to
extremely remote possibilities, an exception under
§ 448.30(4), STATS. He also testified that, given the
description he provided concerning the proce-
dure—removal of all breast tissue, the nipple and part
of the areola—he expected Brown would appreciate
that there would be altered breast sensitivity. Under
§ 448.30(3), a physician need not disclose risks appar-
ent to the patient.

The forgoing testimony sufficiently raised the issue of whether one or more of the exceptions to a doctor's informed consent duty applied. Consequently, the court should have instructed the jury as Dibbell requested.

In sum, we conclude that for purposes of informed consent, a patient would not be contributorily negligent when consenting to a treatment option a doctor presents as viable in all but the most extraordinary instance. We further hold that Dibbell came forth with a sufficient explanation to demonstrate why he did not discuss certain information with Brown, and was therefore entitled to have the jury instructed on the exceptions to his informed consent duty. We therefore remand for a new trial.

*By the Court.*—Judgment reversed and cause remanded with directions.