## NATALIE DEGENNARO v. RAJULA TANDON
### (AC 25104)

Foti, Dranginis and Bishop, Js.

---

Argued January 10—officially released May 24, 2005

*James J. Carroll*, for the appellant (defendant).

*Edward L. Walsh*, with whom, on the brief, was *Jennifer Antognini-O'Neill*, for the appellee (plaintiff).

*Opinion*

DRANGINIS, J. The defendant, Rajula Tandon, appeals from the judgment of the trial court, rendered after the jury's verdict in favor of the plaintiff, Natalie DeGennaro, in this dental malpractice action. The defendant claims that the court improperly denied her motions for a directed verdict and for judgment notwithstanding the verdict because there was insufficient evidence for the jury to find that she (1) failed to inform the plaintiff of all the material risks of the procedure at issue and (2) was negligent because the plaintiff did not present expert testimony on the standard of care. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In early March, 1997, the plaintiff telephoned the office of the dentist she had been seeing for the past fifteen years. The defendant's husband answered the telephone and explained to the plaintiff that her dentist had retired and that the defendant had purchased the dental practice. The plaintiff explained that she was suffering from a toothache, located on the bottom left side of her mouth. The plaintiff scheduled an appointment with the defendant for March 13, 1997.

When the plaintiff entered the defendant's office for the scheduled visit, she noticed that the entire office was in disarray. The defendant explained to the plaintiff that she was renovating the office and that the renovations would be completed by the following week. After the defendant examined the plaintiff, she prescribed an antibiotic for the plaintiff to take to reduce the inflammation in her mouth, and they scheduled another appointment for the following week. The defendant did

not tell the plaintiff that her office was not open for business at that time and that she would not open for business officially until approximately one month after she had seen the plaintiff.

The plaintiff returned to the defendant's office on March 19, 1997. The defendant took an X ray of the plaintiff's mouth. The defendant told the plaintiff that she was going to remove the plaintiff's old filling and replace it with a medicated filling. The defendant administered Novocain to the area of the mouth where she intended to work and then began to drill the affected tooth. When the defendant began drilling the plaintiff's tooth, the plaintiff closed her eyes.

The defendant had ordered new equipment for the office, but this equipment had not arrived by the time of the plaintiff's second appointment. In order to drill the plaintiff's tooth, therefore, the defendant used some of the equipment she had purchased from the dental practice. Specifically, the defendant used a twenty to twenty-five year old unit to power the drill. This unit, the S.S. White, had several components to it. One component was a hose to which the defendant could connect her drill, and the unit would provide the power to the drill. Another part of the unit provided suction. The suction for this unit, however, was not dependable, something which was known widely throughout the dental community. In order to compensate for the unit's failings, the defendant brought in a separate portable suction unit to use on the plaintiff. She threaded the hose of this suction device through a tongue guard, called a Vac-N-Trac, which enabled the defendant both to guard the plaintiff's tongue from injury and to suction excess saliva from the plaintiff's mouth at the same time. The defendant could not recollect having any training or previous experience with either the S.S. White unit or the Vac-N-Trac prior to using both on the plaintiff at the March 19, 1997 appointment. The

defendant did not inform the plaintiff that she had not used this equipment before, nor did she inform the plaintiff that she usually had an assistant present when performing this type of procedure.

Shortly after the defendant began drilling the plaintiff's tooth, the plaintiff's tongue and the bur of the defendant's drill came in contact. The plaintiff was unaware of this until, after hearing the defendant make a noise, she opened her eyes and saw the defendant removing pieces of gauze from the plaintiff's mouth that were soaked in blood. The defendant indicated to the plaintiff that the bur from the drill she had been using had come in contact with the plaintiff's tongue and that she was attempting to stop the bleeding.[1] The defendant stopped the bleeding and gave the plaintiff a prescription for pain medication and her home telephone number in the event an emergency arose. The defendant cautioned the plaintiff not to look at the wound on her tongue immediately, but the plaintiff insisted on seeing the injury to her tongue while at the defendant's office.

The injury to the plaintiff's tongue caused her to suffer several permanent defects, including loss of sensation in the area of the injury, loss of taste, a lisp, occasional loss of food control and occasional drooling

[1] The exact cause of the wound to the plaintiff's tongue was disputed at trial, with the plaintiff claiming that the defendant had touched her tongue with the bur of the drill and the defendant claiming that the plaintiff had swallowed, thereby moving her tongue into the path of the drill. Because the jury returned a verdict in favor of the plaintiff, we can assume that the jury found that the defendant, and not the plaintiff, was the cause of the plaintiff's injury, regardless of the count of the complaint on which the jury found in favor of the plaintiff. See *Gordon* v. *Glass*, 66 Conn. App. 852, 855–56, 785 A.2d 1220 (2001) (causal connection between deviation from standard of care and claimed injury necessary to prevail on medical malpractice claim), cert. denied, 259 Conn. 909, 789 A.2d 994 (2002); *Gemme* v. *Goldberg*, 31 Conn. App. 527, 545, 626 A.2d 318 (1993) (causal connection between breach of duty to inform and claimed injury necessary to prevail on lack of informed consent claim).

out of the left side of her mouth. She also has a shiny, smooth scar on her tongue where she suffered the injury that is visible to others when she speaks. The plaintiff's treating physician testified that these effects of the injury cannot be remedied through speech therapy or surgery.

The plaintiff brought this action in two counts against the defendant in March, 1999. The first count alleged that the defendant was negligent in performing the procedure on the plaintiff, and the second count alleged that the defendant failed to obtain the plaintiff's informed consent prior to performing the procedure. During the trial, the plaintiff offered no expert testimony on the standard of care or the defendant's deviation from that standard. The plaintiff's lack of informed consent claim rested solely on the defendant's failure to inform the plaintiff of her lack of experience with the equipment she used on the plaintiff, her lack of readiness to treat the plaintiff and her lack of staff to aid her in the procedure. The jury found in favor of the plaintiff, awarding her a total of $50,000 in economic and noneconomic damages. This appeal followed.

I

On appeal, the defendant claims that there was insufficient evidence for the jury to conclude that there was a lack of informed consent. Specifically, the defendant argues that, because the plaintiff had had experience with dental drill work, she was not required to advise the plaintiff that if she were to move her tongue during the course of the procedure, she could suffer an injury to her tongue. The defendant principally relies on language our Supreme Court adopted in *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 465 A.2d 294 (1983), in which the court stated: " 'Obviously there is no need to disclose risks that are likely to be known by the average patient or that are in fact known to the

patient usually because of a past experience with the procedure in question.' *Wilkinson* v. *Vesey*, [110 R.I. 606, 627, 295 A.2d 676 (1972)]." *Logan* v. *Greenwich Hospital Assn.*, supra, 292. In advancing this argument, however, the defendant focuses solely on the risks of the procedure itself of which the plaintiff needed to be aware, not on the risks posed by the circumstances under which the defendant performed the procedure. It was these risks, characterized by the defendant's inexperience with the equipment she used, her under-staffed office and her lack of readiness to treat the plaintiff that the plaintiff argues were the bases for her lack of informed consent claim. Whether these provider specific facts can be considered by a jury for a lack of informed consent claim, where the patient did not request information regarding these facts, presents an issue of first impression in our state.

In previous cases in which we and our Supreme Court have considered lack of informed consent claims, the inquiry has been confined to whether the physician has disclosed: "(1) the nature of the procedure, (2) the risks and hazards of the procedure, (3) the alternatives to the procedure, and (4) the anticipated benefits of the procedure." (Internal quotation marks omitted.) Id. Traditionally, our review of this duty to inform has been confined to the actual procedure and has not included provider specific information.[2] See *Alswanger* v. *Smego*,

[2] Recently, in *Duffy* v. *Flagg*, 88 Conn. App. 484, 869 A.2d 1270 (2005), this court had the opportunity to consider whether, in response to pointed questions by a patient, a provider was required to disclose information specific to the provider regarding her past success with the procedure for which the provider was obtaining the patient's informed consent. In concluding that the provider was required to answer fully and truthfully questions relating to provider specific information, this court stated that "we believe that the [trial] court's narrow construction of the doctrine of informed consent is at odds with our Supreme Court's determination in *Logan* that jurors should have the opportunity to determine the scope and amount of information required to support a claim based on lack of informed consent." Id., 492. Although our Supreme Court has not had the opportunity to consider substantively the issue of whether the duty to inform includes

257 Conn. 58, 68, 776 A.2d 444 (2001). The duty to inform, however, requires a physician "to provide the patient with the information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy."[3] (Internal quotation marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 143, 757 A.2d 516 (2000). We conclude that in addition to material information about the procedure to be performed, the duty to inform encompasses provider specific information where the facts and circumstances of the particular situation suggest that such information would be found material by a reasonable patient in making the decision to embark on a particular course of treatment, regardless of whether the patient has sought to elicit the information from the provider. In reaching this conclusion, we join a number of other jurisdictions that have concluded that a patient centered duty to inform necessarily counsels against excluding from that duty to inform information that "a

a duty to disclose provider specific information, our Supreme Court has suggested in dicta that excluded or misleading information of this type could be considered as part of a lack of informed consent claim. See *Janusauskas* v. *Fichman*, 264 Conn. 796, 811, 826 A.2d 1066 (2003) ("In the present case, the defendant told the plaintiff that he successfully had performed [radial keratotomy] on severely myopic patients, and that he thought he could improve the plaintiff's vision to 20/40 or 20/50 in his left eye and 20/20 in his right eye. These representations are of the sort that . . . health care providers may make to their patients within the course of treatment [and] . . . that a reasonable patient may find material in determining whether to undergo a contemplated course of therapy . . . . As with representations regarding the standard of care, if these representations fail to satisfy the requirement of informed consent, and harm results, the remedy would be based upon malpractice . . . ."). Additionally, the dissent in *Alswanger* v. *Smego*, 257 Conn. 58, 68, 776 A.2d 444 (2001) (*Axelrod, J.*, dissenting), argued for the adoption of this more expansive duty to inform.

[3] In this jurisdiction, the duty to inform is governed by a lay standard, not by a medical one. This lay standard covers not only the information the disclosure entails but also whether a duty to inform exists at all. See *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 144–45, 757 A.2d 516 (2000).

reasonable person in the patient's position would need to know in order to make an intelligent and informed decision"; *Johnson* v. *Kokemoor*, 199 Wis. 2d 615, 639, 545 N.W.2d 495 (1996); simply because that information was provider specific as opposed to procedure specific.[4] These jurisdictions have recognized that provider specific information may add to the risks inherent in a particular procedure and may suggest to the patient that a viable and possibly preferable alternative to the procedure may be having the procedure performed by another provider.

"In *Johnson* v. *Kokemoor*, [supra, 199 Wis. 2d 620], a patient brought an action against a surgeon alleging failure to obtain her informed consent to surgery." *Alswanger* v. *Smego*, supra, 257 Conn. 77 (*Axelrod, J.,* dissenting). The *Johnson* defendant, on questioning by the plaintiff, had overstated his rather limited experience with the particular type of aneurysm surgery

[4] We note that several jurisdictions have determined that a provider's duty to inform does not include the disclosure of provider specific information. See, e.g., *Ditto* v. *McCurdy*, 86 Haw. 84, 90, 947 P.2d 952 (1997) (declining "to hold that a physician has a duty to affirmatively disclose his or her qualifications or the lack thereof to a patient" where patient disfigured as result of breast surgery performed by provider lacking appropriate board qualifications); *Foard* v. *Jarman*, 326 N.C. 24, 31, 387 S.E.2d 162 (1990) (no affirmative duty for health care provider to discuss his or her experience where provider perforated patient's stomach wall while performing gastroplasty, resulting in severe complications, including renal failure); *Duttry* v. *Patterson*, 565 Pa. 130, 136, 771 A.2d 1255 (2001) (fact that defendant indicated to patient that he had performed procedure approximately once a month when defendant in fact had performed procedure nine times previously is "evidence of a physician's personal characteristics and experience [that] is irrelevant to an informed consent claim" where leak at surgical site became rupture and resulted in plaintiff suffering from adult respiratory disease syndrome and permanent lung damage); *Whiteside* v. *Lukson*, 89 Wash. App. 109, 112, 947 P.2d 1263 (1997) (that physician previously never had performed procedure on a person "is not a material fact for purposes of finding liability predicated on failure to secure an informed consent" where physician damaged patient's bile duct while attempting to remove gallbladder, resulting in several complications), review denied, 135 Wash. 2d 1007, 959 P.2d 126 (1998).

involved. *Johnson* v. *Kokemoor*, supra, 624. Evidence adduced at trial established that surgeons with much more experience in this area had higher success rates with the surgery than had the defendant and were in relatively close proximity to the hospital in which the defendant intended to perform the surgery. Id., 625–26. There also was evidence that the defendant had understated the morbidity and mortality rate associated with the contemplated surgery. Id., 626. "The court [in concluding that this type of information was admissible to support a lack of informed consent claim] stated: In this case information regarding a physician's experience in performing a particular procedure, a physician's risk statistics as compared with those of other physicians who perform that procedure, and the availability of other centers and physicians better able to perform that procedure would have facilitated the plaintiff's awareness of all of the viable alternatives available to her and thereby aided her exercise of informed consent. . . . We reject the defendant's proposed bright line rule that it is error as a matter of law to admit evidence in an informed consent case that the physician failed to inform the patient regarding the physician's experience with the surgery or treatment at issue. . . . When different physicians have substantially different success rates, *whether surgery is performed by one rather than another represents a choice between alternate, viable medical modes of treatment* . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Alswanger* v. *Smego*, supra, 77 (*Axelrod, J.*, dissenting).

Similarly, "[i]n *Barriocanal* v. *Gibbs*, 697 A.2d 1169, 1170 ([Del.] 1997), an action was brought against a surgeon [in which the plaintiff alleged] lack of informed consent and negligence in performing the surgery. In reversing the trial court's exclusion of the plaintiff's proffered expert testimony[5] that the surgeon had

[5] Unlike the situation in this jurisdiction, in which a lay standard is used, Delaware's informed consent law uses a medical standard for determining

breached the applicable standard of care required to obtain informed consent by failing to inform the patient of the surgeon's lack of recent aneurysm surgery [and of the difference in hospital staffing on a holiday and of the option of transfer to a teaching institution], the court stated: Next, we must determine whether the exclusion of the proffered testimony constituted significant prejudice so as to have denied the appellant a fair trial. By statute in Delaware, a health care provider is required to disclose the *risks and alternatives* to treatment or diagnosis which a reasonable patient would consider material to the decision whether or not to undergo the treatment or diagnosis." (Emphasis in original; internal quotation marks omitted.) *Alswanger* v. *Smego*, supra, 257 Conn. 78 (*Axelrod, J.*, dissenting). We find that the type of qualification information at issue in the present action was relevant to the issue of informed consent. See *Barriocanal* v. *Gibbs*, supra, 1173.

"In *Dingle* v. *Belin*, [358 Md. 354, 357, 749 A.2d 157 (2000)] the plaintiff retained a surgeon to remove her gallbladder. The surgeon was assisted by a medical student and a resident, who was just beginning her fourth year of residency training. . . . The resident dissected the gallbladder and removed it. . . . The plaintiff filed a battery count that was dismissed. She also filed a breach of contract claim and counts for negli-

whether a provider has given adequate information to a patient to obtain his or her informed consent. At the time of the action in *Barriocanal*, § 6852 (a) of title 18 of the Delaware Code provided in relevant part: "No recovery of damages based upon lack of informed consent shall be allowed in any action for malpractice unless . . . (2) The injured party proved by a preponderance of evidence that the health care provider did not supply information regarding such treatment . . . to the extent customarily given to patients . . . by other licensed health care providers with similar training and/or experience in the same or similar health care communities as that of the defendant at the time of the treatment, procedure or surgery." (Internal quotation marks omitted.) *Barriocanal* v. *Gibbs*, supra, 697 A.2d 1170.

gence arising from the lack of informed consent. . . . The thrust of the lack of informed consent count was that without the plaintiff's knowledge or consent, the resident played a very active role in the surgery and did the cutting, clamping and stapling, which should have been performed by the surgeon retained by the plaintiff. . . . The claim was that by failing to inform the plaintiff of the scope of responsibilities that would be performed by the resident, the surgeon and the resident breached their duty to secure the fully informed consent of [the plaintiff] prior to commencing operating upon her."[6] (Citations omitted; internal quotation marks omitted.) *Alswanger* v. *Smego*, supra, 257 Conn. 78 (*Axelrod, J.*, dissenting). The court in *Dingle* stated: "Although . . . claims based on lack of informed consent usually involve allegations that the physician failed to make adequate disclosure of a material risk or collateral effect of the contemplated procedure or of an available alternative not carrying that risk or effect, the duty is not so limited. Risks, benefits, collateral effects, and alternatives normally must be disclosed routinely, but other considerations, at least if raised by the patient, may also need to be discussed and resolved." *Dingle* v. *Belin*, supra, 370.

In *Howard* v. *University of Medicine & Dentistry of New Jersey*, 172 N.J. 537, 800 A.2d 73 (2002), the plaintiff alleged that the defendant's misrepresentation of his credentials and experience induced the plaintiff to undergo surgery that resulted in his being rendered quadriplegic. Id., 543–44. The plaintiff sought to frame this as a claim of fraud. In concluding that the gravamen of the complaint sounded in lack of informed consent and not fraud, the court stated: "[I]f an objectively reasonable person could find that physician experience

---

[6] As a result of an error made by the resident during the surgery, the plaintiff suffered severe pain and discomfort and required additional extensive surgery. *Dingle* v. *Belin*, supra, 358 Md. 358.

was material in determining the medical risk of the corpectomy procedure to which the plaintiff consented, and if a reasonably prudent person in plaintiff's position informed of the defendant's misrepresentations about his experience would not have consented, then a claim based on lack of informed consent may be maintained." Id., 557.

In addition to surgical qualifications, at least one jurisdiction has required providers to disclose personal information that might have bearing on the provider's ability to perform the procedure. In *Hidding* v. *Williams*, 578 So. 2d 1192, 1194 (La. App. 1991), the plaintiff alleged that the defendant failed to obtain his informed consent when the defendant failed to disclose both that nerve damage was a known risk of the surgery and that the defendant was suffering from alcohol abuse at the time of the surgery. In affirming the trial court's finding that there was a lack of informed consent regarding both factors, the appeals court stated: "Of equal if not more importance, the district judge found that [the defendant's] failure to disclose his chronic alcohol abuse to [the plaintiffs] vitiated their consent to surgery. *Because this condition creates a material risk associated with the surgeon's ability to perform, which if disclosed would have obliged the patient to have elected another course of treatment, the fact-finder's conclusion that non-disclosure is a violation of the informed consent doctrine is entirely correct.*" (Emphasis added.) Id., 1196.

Other jurisdictions also have extended this duty to encompass an obligation for providers to inform patients if they have a financial stake in the therapy. In *Moore* v. *Regents of University of California*, 51 Cal. 3d 120, 126, 793 P.2d 479, 271 Cal. Rptr. 146 (1990), cert. denied, 499 U.S. 936, 111 S. Ct. 1388, 113 L. Ed. 2d 444 (1991), the plaintiff consented to a procedure to remove his spleen. He alleged that prior to obtaining

his consent for this procedure, the surgeon performing it had formed the intent to take portions of his spleen to a separate research unit to be used for purposes unrelated to the plaintiff's medical care. Id. Following this procedure, the plaintiff returned to the medical center at the behest of the defendant and on his representations that the visits were necessary for his continued medical care. Id. At these visits, the defendant took samples of the plaintiff's " 'blood, blood serum, skin, bone marrow, aspirate and sperm.' " Id. The plaintiff alleged that, unbeknownst to him, the defendant was using these samples for research purposes unrelated to the plaintiff's care and that the defendant could benefit financially and competitively as a result of the research. Id. The plaintiff's allegations appeared to be confirmed after the defendant developed a cell line from the plaintiff's white blood cells and applied for a patent on the cell line, with the defendant named as the inventor. Id., 127. The court stated: "These allegations . . . state a cause of action . . . properly . . . characterized . . . as the performance of medical procedures without first having obtained the patient's informed consent. . . . [A] physician must disclose personal interests unrelated to the patient's health, whether research or economic, that may affect the physician's professional judgment . . . and . . . a physician's failure to disclose such interests may give rise to a cause of action for performing medical procedures without informed consent . . . . To be sure, questions about the validity of a patient's consent to a procedure typically arise when the patient alleges that the physician failed to disclose medical risks, as in malpractice cases, and not when the patient alleges that the physician had a personal interest, as in this case. The concept of informed consent, however, is broad enough to encompass the latter." (Citations omitted.) Id., 128–29.

Likewise, in *D.A.B.* v. *Brown*, 570 N.W.2d 168, 171 (Minn. App.), review denied, 1997 Minn. LEXIS 995

(December 31, 1997), a class of patients and their parents, who had been prescribed a synthetic growth hormone drug, sued the physician, the drug manufacturer and the drug distributor for breach of fiduciary duty for their involvement in a kickback scheme in which the drug distributor made payments to the physician to induce him to prescribe the hormone. Id., 169. The court noted that, although the plaintiffs framed their claim as a breach of fiduciary duty, "the gravamen of the complaint sounds in medical malpractice. . . . The doctor's duty to disclose the kickback scheme presents a classic informed consent issue." (Citations omitted.) Id., 171.

We are persuaded by these cases and, accordingly, conclude that if the facts and circumstances of a specific case indicate that provider specific information would be material to a reasonable patient in deciding whether to embark on a course of therapy, a provider has a duty to disclose that information to the patient in order to obtain that patient's informed consent. The evidence adduced at trial, which was that the defendant was understaffed, was using equipment with which she was unfamiliar and was using an office that was not ready for business, is the type of provider specific information that a reasonable person in the plaintiff's position would consider material in weighing the risks of this dental procedure and in deciding whether a viable alternative was to seek a different provider to perform the procedure. In reviewing the evidence adduced at trial, we conclude that there was a sufficient factual basis for the jury to determine that a reasonable person in the plaintiff's position would find this information material to her decision to undergo the procedure and, having known this information, would opt not to have the procedure performed by the defendant. See *Davis* v. *Manchester Health Center, Inc.*, 88 Conn. App. 60, 69, 867 A.2d 876 (in sufficiency of evidence claim, court

"must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict"), cert. denied, 273 Conn. 936, 875 A.2d 543 (2005); see also *Clennon* v. *Hometown Buffet, Inc.*, 84 Conn. App. 182, 186, 852 A.2d 836 (2004) (" '[a] factual finding may be rejected by [reviewing] court only if it is clearly erroneous' ").

## II

The defendant also claims that the court improperly permitted the jury to consider the plaintiff's malpractice claim when the plaintiff had presented no expert testimony on the standard of care. Our review of this claim is barred by the general verdict rule.

"Under the general verdict rule, if a jury [returns] a general verdict for one party, and [the party raising a claim of error on appeal did not request] interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party. . . . Thus, in a case in which the general verdict rule operates, if any ground for the verdict is proper, the verdict must stand; only if every ground is improper does the verdict fall. . . . The rule rests on the policy of the conservation of judicial resources, at both the appellate and trial levels. . . .

"On the appellate level, the rule relieves an appellate court from the necessity of adjudicating claims of error that may not arise from the actual source of the jury verdict that is under appellate review. In a typical general verdict rule case, the record is silent regarding whether the jury verdict resulted from the issue that the appellant seeks to have adjudicated. Declining in such a case to afford appellate scrutiny of the appellant's claims is consistent with the general principle of appellate jurisprudence that it is the appellant's responsibility to provide a record upon which reversible error may be predicated. . . .

"In the trial court, the rule relieves the judicial system from the necessity of affording a second trial if the result of the first trial potentially did not depend upon the trial errors claimed by the appellant. Thus, unless an appellant can provide a record to indicate that the result the appellant wishes to reverse derives from the trial errors claimed, rather than from the other, independent issues at trial, there is no reason to spend the judicial resources to provide a second trial. . . .

"Therefore, the general verdict rule is a rule of appellate jurisprudence designed to further the general principle that it is the appellant's responsibility to provide a record upon which reversible error may be predicated. . . . A party desiring to avoid the effects of the general verdict rule may elicit the specific grounds for the verdict by submitting interrogatories to the jury. . . .

Our Supreme Court "has held that the general verdict rule applies to the following five situations: (1) denial of separate counts of a complaint; (2) denial of separate defenses pleaded as such; (3) denial of separate legal theories of recovery or defense pleaded in one count or defense, as the case may be; (4) denial of a complaint and pleading of a special defense; and (5) denial of a specific defense, raised under a general denial, that had been asserted as the case was tried but that should have been specially pleaded." (Internal quotation marks omitted.) *Tetreault* v. *Eslick*, 271 Conn. 466, 471–72, 857 A.2d 888 (2004).

The plaintiff alleged two separate counts in the complaint, and, at trial, the defendant did not request jury interrogatories. This case, therefore, falls under the first situation in which the general verdict rule applies. Without jury interrogatories, we are unable to discern whether the jury found that the defendant was negligent in performing the procedure or that the defendant failed to obtain the plaintiff's informed consent prior to per-

forming the procedure, and that this failure resulted in the plaintiff's submitting to the procedure and suffering the injuries that occurred. Because we have concluded that the jury properly could have found the defendant liable on the lack of informed consent count of the plaintiff's complaint, the general verdict rule bars appellate review of the defendant's claim regarding the absence of expert testimony on the standard of care with respect to the claim of negligence.

The judgment is affirmed.

In this opinion the other judges concurred.