WLOSINSKI v COHN

Docket No. 253286. Submitted July 12, 2005, at Lansing. Decided December 20, 2005, at 9:15 a.m.

Barbara Wlosinski, as personal representative of the estate of her deceased son, Michael Wrobel, brought a medical malpractice wrongful death action in the Oakland Circuit Court against Steven Cohn, M.D.; and William Beaumont Hospital, alleging negligence in connection with a kidney transplant Cohn performed on Wrobel at the hospital. The plaintiff's amended complaint added further negligence claims, including a claim of failure to obtain informed consent. This allegation was based in part on an alleged discrepancy between Cohn's success rate for kidney transplants that he reported to the plaintiff and his actual success rate. The court, Rudy J. Nichols, J., denied the defendants' motion for summary disposition. The jury awarded the plaintiff damages, and the court denied the defendants' motion for judgment notwithstanding the verdict. The defendants appealed.

The Court of Appeals *held*:

1. The trial court erred by denying the defendants' motion for summary disposition on the plaintiff's claim of a lack of informed consent. The doctrine of informed consent requires a physician to warn a patient of the risks and consequences of a medical procedure. A physician's raw success rates, however, do not constitute risk information reasonably related to a patient's medical procedure. The defendants did not have a duty to disclose Cohn's statistical history of transplant failures in order to obtain informed consent.

2. The statistical evidence of Cohn's success rate for kidney transplants was inadmissible as evidence of Cohn's negligence. It was, however, admissible to establish the hospital's knowledge of Cohn's skill for purposes of the plaintiff's claim that the hospital negligently supervised Cohn.

3. Under *Jenkins v Patel*, 471 Mich 158 (2004), the medical malpractice noneconomic damages cap applies to a wrongful death action in which the underlying claim is medical malpractice.

Denial of summary disposition reversed in part, judgment vacated, and case remanded for new trial.

O'CONNELL, P.J., would conclude that the bald statistics of Cohn's success rate are not valid evidence of negligence by the hospital, and would conclude that they are character evidence prohibited under MRE 404(b)(1). Admission of the evidence tainted the verdict and requires a new trial.

SCHUETTE, J., concurred with Judge O'CONNELL regarding the trial court's denial of summary disposition on the informed consent claim, the inadmissibility of Cohn's success rate on the issue of informed consent, and the issue of the noneconomic damages cap, but disagreed regarding the admissibility of Cohn's success rate on the issue of negligent supervision. The trial court's failure to issue an instruction limiting the jury's consideration of that evidence to the negligent supervision claim, however, requires reversal and a new trial.

BORRELLO, J., dissenting, would reject a bright-line rule that a physician never has a duty to disclose to the patient the physician's statistical success rate for a particular medical procedure, and would adopt a patient-centered approach under which a physician has a duty to give provider-specific information that a reasonable person would find material in making the decision to embark on a procedure, regardless of whether the physician is asked. A reasonable patient would find a kidney transplant surgeon's statistical success rate material in making this serious decision. Such information would have identified a particular provider as an independent risk factor. At the very least, it was for the jury, not the trial court, to determine whether the information regarding Cohn's success rate was warranted under the informed consent doctrine, which question must be decided on a case-by-case basis. Moreover, Cohn's success rate was admissible for all of the plaintiff's claims.

PHYSICIANS AND SURGEONS — NEGLIGENCE — MEDICAL MALPRACTICE — INFORMED CONSENT.

A physician's raw statistical success or failure rate does not constitute risk information reasonably related to a patient's medical procedure, and the physician does not have a duty to disclose such statistical data in order to obtain informed consent.

*Mark Granzotto, P.C.* (by *Mark Granzotto*), and *The Thurswell Law Firm* (by *Milton H. Greenman*), for the plaintiff.

*Plunkett & Cooney, P.C.* (by *Robert G. Kamenec*), for the defendants.

Before: O'CONNELL, P.J., and SCHUETTE and BORRELLO, JJ.

O'CONNELL, P.J. In this medical malpractice wrongful death case, defendants appeal as of right a judgment in favor of plaintiff. We reverse the trial court's denial of defendants' motion for summary disposition on plaintiff's claim of lack of informed consent, vacate the trial court's judgment, and remand for a new trial.

In May 1998, the decedent, Michael Wrobel, was diagnosed with kidney failure. At the time of diagnosis, he was a senior in high school. Medical testing confirmed that plaintiff, the decedent's mother, would be a suitable kidney donor. The decedent and his mother researched various hospitals and discovered that defendant William Beaumont Hospital had a high success rate for kidney transplants according to mandatory reports that were posted on the website of a national organization. They visited the hospital and were introduced to defendant Dr. Steven Cohn, who explained the procedure. On July 14, 1999, Dr. Cohn transplanted one of plaintiff's kidneys to the decedent. The decedent suffered severe postoperative complications, including a blood clot in the blood vessel feeding the transplanted kidney. Dr. Cohn removed the clot, but the transplanted kidney ultimately failed anyway. Doctors removed the failed kidney, and the decedent resumed kidney dialysis. The decedent's health continued to decline over the next year, and he ultimately elected to withdraw from kidney dialysis and entered a hospice program. He died on September 24, 2000.

On July 13, 2001, plaintiff filed a medical malpractice wrongful death action against defendants. Plaintiff's original complaint alleged that defendants committed several errors related to the blood clot that appeared after the operation. Plaintiff amended the complaint to include a count for defendants' failure to garner plaintiff's and the decedent's informed consent. Plaintiff based this count on an alleged discrepancy between the hospital's reported success rate for kidney transplants, which she apparently found while researching hospitals, and its actual success rate. She also alleged a discrepancy between the personal success rate Dr. Cohn reported to her and his actual success rate. Plaintiff did not support this amended complaint with an affidavit of merit. Nevertheless, plaintiff again moved to amend her complaint, and the proposed amendments alleged that the negligent use of drugs that suppressed the decedent's immune system led to an infection that caused the kidney to fail. The trial court allowed the amendment, but insisted that plaintiff include an affidavit of merit for the additional counts.

The version of the amended complaint that plaintiff filed differed from the version she attached to her motion to amend. It included additional allegations regarding the negligent use of mesh in the decedent's blood clot operation to hasten healing of the surgical wound. It alleged that the use of mesh led to an infection that compromised the kidney. Plaintiff presented an affidavit of merit from her expert, Raymond Pollak, M.D., who confirmed that defendants' management of the original surgery, their discovery of the blood clot, and its removal failed to conform to the standard of care. Dr. Pollak also ventured his opinion that defendants made the following nontechnical omissions:

i. Failure to address deficiencies in the transplant department . . . and to correct whatever disagreements there were between the transplant team . . . so as to insure proper communications between them and appropriate treatment of the Plaintiff's decedent . . . [.]

j. Failure to investigate/retrain/dismiss incompetent transplant physicians/surgeons . . . which may have prevented the adverse outcomes that occurred . . . [.]

k. Failure to investigate Dr. Cohn's higher than average transplant surgical failure rate in a timely manner and to inform the Plaintiffs of the same [.]

Defendants moved for summary disposition, claiming that plaintiff failed to substantiate any of her claims. Defendants specifically argued that plaintiff's claim of lack of informed consent lacked any factual support because plaintiff's deposition testimony indicated that she was informed of the risks associated with the transplant procedure. The trial court denied the motion, stating that defendants had failed to counter the statement in Dr. Pollak's affidavit that the statistical information withheld from plaintiff and decedent failed to conform to the standard of care. The case proceeded to trial.

At trial, the court allowed plaintiff to present the evidence of Dr. Lawrence Greenberg, who was not certified in Dr. Cohn's specialty, but who repeatedly denigrated Dr. Cohn's surgical abilities primarily on the basis of a string of failed transplants. Dr. Greenberg's testimony harped on Dr. Cohn's failure rate leading up to the decedent's surgery. Dr. Greenberg testified that five out of seven of Dr. Cohn's kidney transplants had failed in the months before the decedent's surgery. When the defense tried to shed some light on the circumstances surrounding the failed transplants, the trial court correctly ruled that privilege precluded plaintiff from obtaining and presenting details of Dr.

Cohn's failures, so it would not allow the evidence. Under these circumstances, the statistics remained raw numbers without any factual development that might suggest a correlation between the other failed transplants and the decedent's transplant. Plaintiff's experts made further comments about Dr. Cohn's failure rate, and plaintiff's counsel emphasized the sequence of failed transplants in his closing arguments. The jury awarded plaintiff $1.475 million in damages, and the trial court, after making relatively minor adjustments, entered judgment for roughly $1.5 million.

Defendants contend that the trial court erred in denying their motions for summary disposition and judgment notwithstanding the verdict on plaintiff's claim that Dr. Cohn failed to obtain the decedent's informed consent before surgery. According to defendants, a physician has no duty to disclose to a patient the physician's success rates for a particular medical procedure, and Dr. Cohn's failure to advise the decedent of his success rates could not, as a matter of law, taint the patient's consent. We agree. We review de novo a trial court's decision to grant summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

The doctrine of informed consent requires a physician to warn a patient of the risks and consequences of a medical procedure. *Lincoln v Gupta*, 142 Mich App 615, 625; 370 NW2d 312 (1985). By itself, Dr. Cohn's success rate was not a risk related to the medical procedure. *Id.* In fact, none of the affidavits of merit accompanying plaintiff's complaints indicates that disclosure of Dr. Cohn's particular success rate was necessary to obtain informed consent according to the standard of care. As a matter of law, we hold that a

physician's raw success rates do not constitute risk information reasonably related to a patient's medical procedure.[1]

The other jurisdictions that have addressed similar issues agree. See *Howard v Univ of Medicine & Dentistry of New Jersey*, 172 NJ 537, 553-554; 800 A2d 73 (2002), and the cases it cites. Although many jurisdictions recognize only deceit-based claims or no claim at all, see *Duttry v Patterson*, 565 Pa 130, 136-137; 771 A2d 1255 (2001); *Ditto v McCurdy*, 86 Hawaii 84, 90-91; 947 P2d 952 (1997), some jurisdictions have allowed evidence about a doctor's inexperience, but only in cases in which the doctor asserted his or her experience and competence; see *Howard, supra* at 558-559; *Johnson v Kokemoor*, 199 Wis 2d 615, 624; 545 NW2d 495 (1996). Even those jurisdictions do not require wholesale statistical disclosure, but approach a doctor's qualifications as they relate to the procedure's particular risks, an ordinary patient's willingness to accept those risks in light of the alternatives, and the causal connection between the disclosure and the actual harm. *Howard, supra; Johnson, supra*. For example, although the Wisconsin court in *Johnson* allowed the statistical evidence to stand, it specifically warned against the adoption of a standard of care that universally required statistical disclosure. *Johnson, supra* at 645-646. Moreover, the New Jersey court in *Howard* did not automatically sanction a probe into the doctor's experience, but

---

[1] Our holding is limited to the disclosure of statistical data regarding past treatment and other background information that has no concrete bearing on the actual risks of a given procedure. Certainly if a surgeon unfailingly faints at the sight of blood, a reasonable patient might want to know this and explore other treatment options. Between these poles, however, lies a world of scenarios that requires trial courts to remain vigilant in their roles as evidentiary gatekeepers. MRE 702. The trial court did not exercise that role in this case.

remanded the case so that the trial court could perform
its "gatekeeper function," which it defined as a "signifi-
cant" role assigned "to prevent insubstantial claims . . .
from proceeding to a jury." *Howard, supra* at 558.
Emphasizing the causation standard, the court stated,⁴
"We contemplate that misrepresented or exaggerated
physician experience would have to significantly in-
crease a risk of a procedure in order for it to affect the
judgment of a reasonably prudent patient in an in-
formed consent case." *Id.* The court specifically noted
that New Jersey has never placed a duty on doctors "to
detail [their] background[s] and experience[s] as part of
the required informed consent disclosure . . . ." *Id.* at
554.

In this case, plaintiff's deposition reflected that Dr.
Cohn vaguely represented his transplant history as
"good,"² and that he otherwise informed plaintiff and
the decedent of the medical risks that were directly
related to the surgery. Therefore, we do not even
approach the type of misrepresentation that may urge a
contrary result. Also, unlike the cases involving misrep-
resented experience, this case lacks any hint of a
relationship between Dr. Cohn's previous failed trans-
plants and the failure of the decedent's new kidney.³
Without a compelling case before us, we simply hold
that defendants, as a matter of law, did not have a duty

---

² In fact, the evidence reflects that at the time of these statements, Dr.
Cohn's success rate was very good.

³ On this point, it should be noted that the clearest definition of a
"failed" transplant, which underlay the controversial statistic, was the
loss of the transplanted organ, for any reason, within a year. As
defendants pointed out below, "any reason" might include a car
accident or some other totally unrelated happenstance. Therefore, the
bare statistics were totally unrelated to the risks of transplant surgery
and could never satisfy the criterion of actually causing the injury
here.

to disclose Dr. Cohn's statistical history of transplant failures to obtain the decedent's informed consent.

Regarding plaintiff's other uses of this statistical evidence, our courts have long recognized the distinction between a doctor's negligence and a treatment's failure. *Roberts v Young*, 369 Mich 133, 138; 119 NW2d 627 (1963). "[T]he bare fact that full recovery does not result, or that a surgical operation is not entirely successful, is not in itself evidence of negligence." *Id.*, quoting *Zoterell v Repp*, 187 Mich 319, 330; 153 NW 692 (1915). Therefore, bare numerical success rates are not, in themselves, evidence that a doctor did anything wrong. For example, it is absolutely unknown, and unknowable, whether the preceding kidney transplants performed by Dr. Cohn failed because of health complications that rendered those patients "high risk" patients.[4] We will not permit an inference of negligence to flow from unsuccessful treatment alone. *Roberts, supra* at 138. Yet, by allowing the limited inclusion of the mere existence of these transplant failures, the court allowed the jury to conclude that Dr. Cohn had a proclivity to fail. Because the bald statistics are not valid evidence of negligence either by Dr. Cohn or by the hospital, and because they are not relevant to informed consent,[5] we fail to see what purpose they serve other than as prohibited character evidence. MRE 404(b)(1).

---

[4] We note that one of the foreseeable consequences of requiring doctors, especially surgeons, to disclose their success rates as a condition to our deeming a patient's consent "informed" is that it would encourage doctors to treat only those patients who will likely boost their success rates, rather than the frail, "high risk" patients who truly and desperately need the specialized care that doctors offer.

[5] Pennsylvania recognizes that facts failing to support a claim of lack of informed consent might support a claim of fraud, *Duttry, supra* at 137, but neither the pleadings nor the particulars of this case support a fraud claim here, so we do not examine this as an alternative.

There can be no doubt that plaintiff's counsel paraded the statistics before the jury to show that Dr. Cohn had a propensity to botch transplants. Propensity evidence is barred because it diverts a jury's attention from the facts of the case being tried and focuses it on the probability that the defendant, who has made so many mistakes before, made one again. Cf. *People v Matthews*, 17 Mich App 48, 51-52; 169 NW2d 138 (1969). In other words, it punishes a defendant for his misfortune rather than his fault. The ploy worked especially well in this case, because the details and circumstances of the previous surgeries were kept from the jury, and the jury was not instructed to limit its use of the invalid evidence. This evidence fatally tainted the jury's verdict, and a new trial is in order. MRE 103.

Defendants also raise several challenges to plaintiff's experts, but because we remand for a new trial, it is unnecessary to resolve all these issues here. Nevertheless, we agree with defendants that the trial court failed to perform its gatekeeping mission under *Craig v Oakwood Hosp*, 471 Mich 67, 78-81; 684 NW2d 296 (2004), and MRE 702. On remand, the court should hold a hearing and evaluate the factual and medical underpinnings of Dr. Pollak's anticipated testimony. We also note that neither Dr. Greenberg nor Dr. Evan Morton was qualified to testify against Dr. Cohn regarding the standard of care because they were not board-certified in the same specialty as Dr. Cohn. MCL 600.2169. Their evidence should be limited accordingly. The trial court must also examine the relevance of Dr. Greenberg's testimony apart from the invalid statistical information he provided at trial and carefully review it for probative value and relevance to the decedent's surgery. It should go without saying, however, that we do not bar Dr. Greenberg from providing other, admissible testimony. Similarly, Dr. Morton's testimony did not exclusively

relate to whether Dr. Cohn breached the standard of care; it also related to a Doppler ultrasound performed on the night of the transplant. Expert testimony is admissible under MRE 702 if (1) the expert is qualified, (2) the testimony assists the trier of fact to understand the evidence or determine a fact in issue, and (3) the testimony is derived from recognized scientific, technical, or other specialized knowledge. *Craig, supra* at 78-79. Without deciding the issue, it appears to us that Dr. Morton's testimony may be relevant to plaintiff's theory of the case.

Finally, defendants argue that the trial court erred in refusing to cap plaintiff's monetary award for wrongful death damages regarding the decedent's funeral and burial expenses and plaintiff's loss of society and companionship. Because we are remanding for a new trial, we merely note that "the medical malpractice noneconomic damages cap does apply to wrongful death actions where the underlying claim is medical malpractice . . . ." *Jenkins v Patel*, 471 Mich 158, 161; 684 NW2d 346 (2004). The parties should approach the case accordingly.

Denial of summary disposition reversed in part, judgment vacated, and case remanded for new trial. We do not retain jurisdiction.

SCHUETTE, J. (*concurring in part and dissenting in part*). I concur in the conclusion reached by my colleague, Judge O'CONNELL, in reversing the trial court's denial of defendants' motion for summary disposition on plaintiff's claim of lack of informed consent as well as in his determination that evidence of Dr. Cohn's success/failure rate was not admissible on the issue of informed consent. MRE 404. In addition, as referenced by Judge O'CONNELL, the decision by our Supreme

Court in *Jenkins v Patel*, 471 Mich 158, 161; 684 NW2d 346 (2004), is dispositive of this case, has retroactive effect, and accurately stands for the proposition that the noneconomic damages cap applies to a wrongful death action with an underlying medical malpractice claim.

I differ, however, and therefore dissent on the admissibility of Dr. Cohn's success/failure rate with respect to plaintiff's claims of negligent supervision by defendant William Beaumont Hospital of Dr. Cohn. While evidence of Dr. Cohn's success/failure rate is inadmissible with respect to plaintiff's informed consent claim (MRE 404), Dr. Cohn's success/failure rate is relevant (MRE 401), admissible (MRE 404[b]) evidence concerning plaintiff's cause of action for negligent supervision.[1] MRE 404(b)(1) specifically lists evidence demonstrating a party's knowledge of a fact among the types of evidence of past acts that are not excluded by MRE 404. In contrast to the opinion of my distinguished colleague Judge O'CONNELL, in accord with MRE 404(b)(1), Dr. Cohn's success/failure rate was *not* character evidence for the purposes of plaintiff's negligent supervision claim against Beaumont Hospital because it was used to establish the hospital's knowledge of Dr. Cohn's skill.

However, the trial court failed to issue an instruction limiting the jury's consideration of the success/failure

---

[1] It is possible that evidence would be admissible for one purpose and not another because a determination of whether past acts evidence is excluded under MRE 404(b) hinges on the purpose for which it is offered. *People v Johnigan*, 265 Mich App 463, 465-466; 696 NW2d 724 (2005). That said, defendants would likely be entitled to a limiting instruction pursuant to MRE 105, which states that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly," as well as consideration under MRE 403.

rate evidence to the negligent supervision claim against Beaumont Hospital and cautioning against considering it for the purposes of the informed consent and negligence actions against Dr. Cohn.[2] The failure to issue a limiting instruction was error requiring reversal and constitutes grounds for a new trial.

BORRELLO, J. (*dissenting*). I respectfully dissent because I believe that the jury should have been permitted to determine whether Dr. Cohn failed to obtain the decedent's informed consent to a kidney transplant by failing to disclose to the decedent his statistical failure rate for kidney transplants. I disagree with the majority's creation of a bright-line rule that a physician never has a duty to disclose to a patient the physician's statistical success or failure rate for a particular medical procedure. I would affirm the trial court's denial of defendants' motion for summary disposition on plaintiff's claim of lack of informed consent, as well as the judgment in favor of plaintiff.

Dr. Cohn had a duty to warn the decedent about the risks and consequences of kidney transplant surgery. *Lincoln v Gupta*, 142 Mich App 615, 625; 370 NW2d 312 (1985). In a negligence action, whether a person has breached a duty of reasonable care is generally an issue for the finder of fact. *Case v Consumers Power Co*, 463

---

[2] Contrary to my distinguished colleague, Judge BORRELLO, I believe this issue was adequately preserved for review. While defendants' arguments opposing the consideration of Dr. Cohn's individual success rates were largely discounted by the trial court because of their noncompliance with page-limit requirements, the oral arguments, motion for reconsideration, motion for a directed verdict, and requested cautionary instruction (on which the trial court never ruled) sufficiently developed the parties' arguments for this Court's consideration.

Mich 1, 7; 615 NW2d 17 (2000).[1] Only when there is an " 'overriding legislatively or judicially declared public policy' " should the court decide the standard of care as a matter of law. *Id.*, quoting *Moning v Alfono*, 400 Mich 425, 438; 254 NW2d 759 (1977).

I see no reason to depart from the general rule that it is for the finder of fact, and not the trial court, to decide whether a defendant in a negligence action has breached a duty of reasonable care. Furthermore, there are not sufficiently compelling public policy reasons that would justify removing this issue from the jury's consideration and allowing the trial court to decide the standard of care as a matter of law. The jury was in the best position to consider the particular facts of this case and determine whether Dr. Cohn breached the standard of care by failing to inform the decedent of his statistical failure rate for kidney transplants.

In their opinions, my brother jurists assert that Dr. Cohn's success rate was not a risk related to the medical procedure and that Dr. Cohn therefore had no duty to disclose such information under the doctrine of informed consent. This is true under the more traditional view of a physician's duty to inform, in which the duty to inform is "confined to the actual procedure" and does not include "provider specific information." See *De-Gennaro v Tandon*, 89 Conn App 183, 189; 873 A2d 191 (2005). However, I reject such a narrow and outdated construction of the doctrine of informed consent and embrace a more expansive, patient-centered view of a physician's duty to inform a patient, as the Connecticut Court of Appeals did in *DeGennaro*. In holding that the

---

[1] Furthermore, in medical malpractice cases, whether there is a breach of the standard of care generally requires expert testimony, and the credibility of the experts is primarily a "question for consideration by the jury." *Wilson v Stilwill*, 411 Mich 587, 599; 309 NW2d 898 (1981).

defendant dentist's duty to obtain the plaintiff pa-
tient's informed consent to a dental procedure re-
quired the defendant to disclose to the plaintiff
"provider specific information," including the fact
that the defendant was understaffed, that the defen-
dant's office was not ready for business, and that the
defendant was using equipment with which she was
unfamiliar, the *DeGennaro* court asserted:

> The duty to inform, however, requires a physician "to
> provide the patient with the information which a reason-
> able patient would have found material for making a
> decision whether to embark upon a contemplated course
> of therapy." (Internal quotation marks omitted.) *Godwin
> v. Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn.
> 131, 143; 757 A.2d 516 (2000). We conclude that in
> addition to material information about the procedure to
> be performed, the duty to inform encompasses provider
> specific information where the facts and circumstances
> of the particular situation suggest that such information
> would be found material by a reasonable patient in
> making the decision to embark on a particular course of
> treatment, regardless of whether the patient has sought
> to elicit the information from the provider. In reaching
> this conclusion, we join a number of other jurisdictions
> that have concluded that a patient centered duty to
> inform necessarily counsels against excluding from that
> duty to inform information that "a reasonable person in
> the patient's position would need to know in order to
> make an intelligent and informed decision"; *Johnson v.
> Kokemoor*, 199 Wis.2d 615, 639; 545 N.W.2d 495 (1996);
> simply because that information was provider specific as
> opposed to procedure specific. These jurisdictions have
> recognized that provider specific information may add to
> the risks inherent in a particular procedure and may
> suggest to the patient that a viable and possibly, prefer-
> able alternative to the procedure may be having the
> procedure performed by another provider. [*DeGennaro,
> supra* at 190-191.]

I would adopt this patient-centered approach to a medical provider's duty to obtain informed consent. Under this approach, in addition to material information about the kidney transplant procedure itself, Dr. Cohn also had a duty to give the decedent "provider specific information" if such information would be found material by a reasonable person in making the decision to embark on a kidney transplant. See *id.* It is axiomatic that a reasonable patient would find information regarding a kidney transplant surgeon's statistical success and failure rates for kidney transplants to be material in making the decision whether to proceed with a surgical procedure as serious as a kidney transplant. Moreover, Dr. Cohn had a duty to supply such information regardless of whether the decedent sought to elicit such information. See *id.* at 190. In *Johnson v Kokemoor*, 199 Wis 2d 615, 620, 641; 545 NW2d 495 (1996), the Supreme Court of Wisconsin held that evidence of a physician's statistical success rate is material to a patient's decision to consent to a medical procedure. In *Johnson*, the court held:

> When different physicians have substantially different success rates, *whether surgery is performed by one rather than another represents a choice between "alternate, viable medical modes of treatment"* . . . .
>
>            \* \* \*
>
> The doctrine of informed consent requires disclosure of "all of the viable alternatives and risks of the treatment proposed" which would be material to a patient's decision. We therefore conclude that when different physicians have substantially different success rates with the same procedure and a reasonable person in the patient's position would consider such information material, the circuit court may admit this statistical evidence. [*Id.* at 645 (emphasis added; citation omitted).]

Similarly, I believe that information about Dr. Cohn's success and failure rates would have aided the decedent's exercise of informed consent because it would have identified "a particular provider as an independent risk factor." *Id.* at 644-645. At the very least, whether "provider specific information" regarding Dr. Cohn's statistical failure rate for kidney transplants was warranted under the facts and circumstances of the case should have been determined by the jury, and not by the trial court. I reject the majority's bright-line rule that, as a matter of law, Dr. Cohn had no duty to provide information regarding his statistical failure rate for kidney transplants to the decedent under the informed consent doctrine. Rather, the jury should have had the opportunity to determine the scope and amount of information required and whether Dr. Cohn was required to disclose "provider specific information" regarding his failure rate for kidney transplant surgeries.

Like the court in *Johnson,* I do not believe that the doctrine of informed consent always requires physicians to give patients statistical information regarding their success or failure rates for a particular procedure. *Id.* at 646 ("We caution . . . that our decision will not always require physicians to give patients comparative risk evidence in statistical terms to obtain informed consent."). Rather, such questions are fact-driven and context-specific and must be decided on a case-by-case basis. See *id.* In my view, the majority's holding disregards the individual facts of this case and invades the province of the jury:

> "There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men,

have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs." [*Case, supra* at 10, quoting *Grand Trunk R Co v Ives*, 144 US 408, 417; 12 S Ct 679; 36 L Ed 2d 485 (1892).]

I believe that the jury, and not the trial court, should have been permitted to determine whether the standard of care required Dr. Cohn to disclose statistics regarding his success rate for kidney transplant surgeries, and I disagree with the majority's bright-line conclusion that Dr. Cohn, as a matter of law, had no duty to disclose his statistical history of transplant failures to obtain the decedent's informed consent. Such a determination was properly a matter for the jury to decide because in this case defendant hospital held itself out as a statistical leader in such operations.[2] Thus, I would conclude that the trial court did not err in denying

---

[2] A patient's physician, not the hospital where a procedure is performed, has the duty to impart information to a patient regarding the risks and consequences of a medical procedure. *Lincoln, supra* at 625. While I refrain from examining the issue in this case, I believe that the area of law involving a hospital's duty to inform patients when the hospital makes advertising claims to induce patients to use its facilities requires closer scrutiny with a special focus on whether the hospital, by way of advertising, should have imposed on it a heightened duty to patients in the area of informed consent than has previously been recognized by the courts in this state. I note that nothing in the law forbids this Court from holding hospitals to the same standard as other businesses who engage in deceptive or misleading trade practices.

defendants' motion for summary disposition on plaintiff's claim that Dr. Cohn failed to obtain the decedent's informed consent.

I would further hold that evidence regarding Dr. Cohn's failure rate for kidney transplantation was admissible under MRE 403 for all of plaintiff's claims. Under MRE 403, the trial court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403; *Lewis v LeGrow*, 258 Mich App 175, 199; 670 NW2d 675 (2003). Unfair prejudice does not mean "damaging." *Id.* MRE 403 only prohibits evidence that is unfairly prejudicial. Evidence is unfairly prejudicial if there is a danger that evidence that is only marginally probative will be given undue or preemptive weight by the jury. *Lewis, supra* at 199. I agree with the majority that evidence of Dr. Cohn's statistical failure rate for kidney transplants is, at most, only marginally relevant to whether Dr. Cohn's care of the decedent was negligent in this particular case. However, given the fact that there was a substantial amount of testimony regarding Dr. Cohn's negligence specifically relating to the decedent in this case, there was little chance that the jury would give evidence regarding Dr. Cohn's overall success or failure rate undue or preemptive weight. Therefore, I believe that the evidence, while somewhat damaging, was not unfairly prejudicial. Furthermore, like my brother jurist Judge SCHUETTE, I would also conclude that evidence of Dr. Cohn's failure rate for kidney transplants was not precluded by MRE 404(b)(1) because such evidence was not character evidence. MRE 404(b)(1) prohibits the use of evidence to prove a person's character to show that the person acted in

conformity with that character on a particular occasion, but does not preclude using such evidence for other relevant purposes. *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000). The rule limiting the admissibility of bad acts evidence applies in civil cases as well as criminal cases. *Lewis, supra* at 207. MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 404(b)(1) "is a rule of inclusion" that "permits the admission of evidence on any ground that does not risk impermissible inferences of character to conduct." *People v Starr*, 457 Mich 490, 496; 577 NW2d 673 (1998). To be admissible under MRE 404(b)(1), the evidence must be offered for something other than a character or propensity purpose, it must be relevant, and the probative value of the evidence must not be substantially outweighed by unfair prejudice under MRE 403. *People v Knox*, 469 Mich 502, 509; 674 NW2d 366 (2004). "Character evidence" is "[e]vidence regarding someone's general personality traits or propensities" or "evidence of a person's moral standing in a community." Black's Law Dictionary (8th ed), p 595. Evidence that Dr. Cohn had a high statistical failure rate for kidney transplants is not suggestive of any type of general personality trait and reveals nothing about the moral or ethical composition of Dr. Cohn. Furthermore, in this case, the testimony was not offered to prove that Dr. Cohn acted in conformity with a charac-

ter trait on a particular occasion. The testimony therefore "does not risk impermissible inferences of character to conduct." *Starr, supra* at 496. I therefore would hold that evidence regarding Dr. Cohn's success or failure rate for kidney transplant surgeries by definition did not constitute character evidence and falls outside the ambit of MRE 404(b)(1).

Unlike my esteemed colleagues Judges O'CONNELL and SCHUETTE, I do not believe that the trial court's admission of the evidence regarding Dr. Cohn's failure rate for kidney transplant surgeries or failure to issue a limiting instruction on the use of such evidence requires a new trial in this case. Admittedly, evidence regarding Dr. Cohn's statistical failure rate for kidney transplant surgeries is only marginally, if at all, relevant to whether Dr. Cohn's care of the decedent was negligent in this particular case. However, the evidence was not improper character evidence under MRE 404(b)(1). Furthermore, in light of the substantial amount of testimony regarding Dr. Cohn's negligence in this specific case, there was little chance that the jury would give evidence regarding Dr. Cohn's overall success or failure rate undue weight. Therefore, the failure to give a limiting instruction was harmless.

For all these reasons, I respectfully dissent.